MICHAEL D. PAVILON, Sole Proprietor of Sunshine Distributing Company, Plaintiff and Counterdefendant-Appellant, v. ROXANA KAFERLY, Defendant and Counterplaintiff-Appellee.

First District (5th Division) No. 1—88—3769

Opinion filed September 28, 1990.

Richard S. Connors, of Chicago, for appellant.

Herbert L. Stern, Jr., Marc R. Jacobs, and S. Bennet Rodick, all of Gottlieb & Schwartz, of Chicago (Michael D. Pavilon, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:
A jury returned a general verdict in favor of the defendant-counterplaintiff, Roxana Kaferly (hereinafter Kaferly), on her counter-

claim against the plaintiff-counterdefendant, Michael Pavilon (hereinafter Pavilon), for intentional infliction of emotional distress, conversion and defamation and awarded her $50,750 in compensatory and $20,000 in punitive damages. After the trial judge reduced the compensatory damages by $20,000, he entered judgment on the verdict. On appeal, Pavilon seeks a reversal of that judgment, contending: (1) the trial court had no jurisdiction to consider the intentional infliction of emotional distress claim; (2) Kaferly failed to prove the elements of intentional infliction of emotional distress, conversion and defamation; and (3) Kaferly failed to prove the damages awarded in the judgment. Alternatively, he seeks a new trial, contending: (1) the trial judge's conduct and remarks so prejudiced him that he was denied a fair and impartial trial, and (2) the trial judge erroneously instructed the jury on the issue of intentional infliction of emotional distress. On cross-appeal, Kaferly contends that the trial judge improperly granted the $20,000 remittitur of the jury award. We reverse and remand this matter for a new trial based on the trial judge's conduct and remarks.

Before resolving the various issues raised by this appeal, a brief introduction of the parties and the history of their litigation will be helpful. Kaferly and Pavilon met in November of 1979 and thereafter began dating each other. According to Kaferly, they continued to date until the middle of 1983. According to Pavilon, they continued to date until March of 1985. In November of 1983, Kaferly went to work first as a typist for Pavilon in his business, Sunshine Distributing Company, a sole proprietorship, and shortly thereafter transferred to a sales position. Pavilon fired her from that position in March of 1985.

Pavilon initiated this litigation by filing suit against Kaferly to recover a sum of money he claimed she owed him from her employment with him. Kaferly responded by denying that she owed any money and by filing a counterclaim, alleging intentional infliction of emotional distress, conversion, and defamation. Her intentional infliction of emotional distress claim was based on alleged outrageous conduct committed by Pavilon both during and after her employment with him. The conversion claim was based on her allegations that after Pavilon fired her, he refused to return a desk belonging to her. The defamation claim was based on her allegations that Pavilon published a defamatory letter about her, claiming that she was misrepresenting the "solids" content of a floor finish product that she was selling for a competitor of Pavilon after she was discharged from his employment.

In April of 1988, Pavilon's complaint and Kaferly's counterclaim proceeded to trial together, with Pavilon choosing to act as his own

attorney. Although the appellate record does not include a complete transcript of the portion of the trial dealing with Pavilon's complaint, the record does disclose that the trial court directed a verdict in Kaferly's favor on the complaint. Thereafter, Kaferly proceeded with her counterclaim.

## SUBSTANTIVE ISSUES

We will first deal with the issues raised by Pavilon concerning Kaferly's claim for intentional infliction of emotional distress. Pavilon contends that the claim for intentional infliction of emotional distress was actually a claim for sexual harassment occurring during the period of Kaferly's employment with him and, as such, was not within the subject matter jurisdiction of the trial court. He argues that since sexual harassment arising out of an employment relationship is a civil rights violation under the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, pars. 1—101 *et seq.*), the claim should have been filed with the Department of Human Rights and not with the court. Pavilon also contends that Kaferly failed to prove the elements of intentional infliction of emotional distress. However, he offers no argument or citation of authority to support the latter contention.

At trial, Kaferly testified that she had been undergoing psychotherapy for various personal and emotional problems since 1979 but that by the end of 1983 her condition had improved to the point where she would have been ready to terminate her treatment. In November of 1983, several months after her romantic relationship with Pavilon had ended, she agreed to work for Pavilon but only after they stipulated that their relationship would be limited strictly to matters of business. Nonetheless, soon after she started working for him, he began urging her to attend certain social and family affairs with him. Although she occasionally refused to attend these affairs with him, on other occasions she would agree to accompany him because he said that "things would be easier on her if she went." She stated that after attending affairs with Pavilon, conditions at work would in fact ease up for her. Towards the end of summer, 1984, Pavilon became more insistent that she attend various social and family affairs with him. Additionally, he began to make overt sexual propositions to her, bizzarely offering her $100 to have sex with him. On 8 to 10 occasions, stretching from the end of summer, 1984 to early 1985, he approached her with similar money for sex propositions. Though Kaferly rejected these offers, she testified that she was humiliated and degraded by them and felt "like someone more powerful was trying to stamp her down."

In March of 1985, after Kaferly told Pavilon that she could not continue to attend family or social functions with him, he fired her. She testified, without supplying further details, that when she attempted to leave after being fired, he blocked her path and threatened her, eventually allowing her to leave.

According to Kaferly's testimony, in April of 1985, after Pavilon had angrily telephoned her on several occasions, she met him at a restaurant in the hope of finding out why he was so upset. At this meeting, Pavilon told her that he wanted her to resume her employment with him. When she refused, he then told her that on the day that he fired her, "he had wanted to rape *** [her] and he still *** wanted to [rape her]." He also said that he would still pay her $100 a night, by company check, for sexual favors if she were agreeable. Pursuant to the advice of her psychotherapist, she asked him to put that proposition in writing. He then dictated the following note to her:

> "Sunshine Dist. Co. will take off $100, per night of sexual favors (more $ for kinky acts) from the advance. Weeknights no more than 2x per week. To begin at 10:30. START."

After Kaferly prepared the note, Pavilon signed it. She then took the note and left the restaurant. This note was admitted into evidence as one of Kaferly's exhibits.

After Pavilon fired Kaferly, she began to work for Rower Chemical Company, a competitor of Pavilon. She testified that thereafter, Pavilon engaged in numerous and repeated acts designed to harass, frighten, and embarrass her. She testified that at different times Pavilon threatened to kill her, rape her, and challenge by lawsuit her right to custody of her son. She also testified that Pavilon persistently sent letters to her, her parents and her psychotherapist and spread false information regarding her, including information that her new employer was no longer in business. She did not, however, provide greater detail or elaboration of these charges in her direct testimony nor was she asked to do so on cross-examination. She also testified that Pavilon engaged in acts of harassment directed at her new employer, which included telephoning its 86-year-old president in the early morning hours, filing spurious complaints against it with the Illinois Attorney General's Consumer Fraud Division, and filing for a Federal trademark on a product name which he knew her new employer had been using for years.

Kaferly testified that as a result of Pavilon's conduct, she was forced to extend her psychotherapeutic treatment which she otherwise would have been ready to terminate in 1983.

Kaferly's psychotherapist, Theodore Gluck, testified that some-

time in 1984 Kaferly told him about Pavilon's sexual harassment. He confirmed Kaferly's testimony that he advised her to stand up to Pavilon and suggested that she obtain something in writing regarding his money for sex propositions. He also confirmed that Kaferly's condition had progressed to the point where by the end of 1983 she would have been ready to terminate her psychotherapeutic treatment but for the problems that Pavilon was creating. He observed that these problems had made her a very frightened and angry person who had great difficulty dealing with her child, her work, men generally and with her own feeings. He stated that she was still undergoing psychotherapy with him and estimated that treatment for her problems resulting from Pavilon's conduct had cost $6,000 a year from 1985 forward.

Pavilon testified that he had worked as a psychotherapist and was at all relevant times aware of the fact that Kaferly was undergoing therapy. He stated that he and Kaferly had a close, personal, warm and loving relationship until March of 1985, when they broke up because of personal and business conflicts. He admitted signing the note offering to pay money to Kaferly for sexual favors and also admitted that he had made a similar proposition to someone other than Kaferly.

Pavilon's contention that the trial court lacked subject matter jurisdiction to consider Kaferly's intentional infliction of emotional distress claim has as its premise that the Illinois Human Rights Act preempts any tort claim based on employment related conduct which may be characterized as sexual harassment. It should be noted at the outset that even if he were correct in his premise, the trial court would only lack subject matter jurisdiction to consider conduct which occurred during Kaferly's employment with Pavilon. It would not limit the trial court's jurisdiction to consider Pavilon's conduct after the employment relationship ended.

Moreover, the precise issue of whether a trial court has jurisdiction to consider an intentional infliction of emotional distress claim based on employment-related conduct which may be characterized as sexual harassment was considered by the Federal District Court for the Northern District of Illinois in *Bailey v. Unocal Corp.* (N.D. Ill. 1988), 700 F. Supp. 396. There, a plaintiff claimed intentional infliction of emotional distress based on her supervisor's sexual harassment occurring during her employment with Unocal Corporation. After reviewing the various causes of action preempted by the Human Rights Act, the *Bailey* court held that the Act does not preempt a civil action for intentional infliction of emotional distress under such circumstances. (Accord *Ritzheimer v. Insurance Counselors,*

*Inc.* (1988), 173 Ill. App. 3d 953, 527 N.E.2d 1281; *Clay v. Quartet Manufacturing Co.* (N.D. Ill. 1986), 644 F. Supp. 56.) In making this determination, the court set forth the following criteria for determining whether the Human Rights Act preempts any tort which occurs in an employment setting:

> "Where the elements of the tort require proof of nothing more than that proscribed by the Act, and where the tort merely furthers the same policies as the statute, the IHRA [Illinois Human Rights Act] will preempt the tort action. But where the tort requires more, and thereby furthers goals in addition to those addressed by the IHRA, the Act will not preempt the claim." (*Bailey*, 700 F. Supp. at 404.)

Finding that the tort of intentional infliction of emotional distress required proof of more than was required for sexual harassment and served a different policy than that served by the Human Rights Act, the *Bailey* court concluded that a claim for intentional infliction of emotional distress was not preempted by the Human Rights Act.

Though we are not bound to follow the decision of a Federal district court on this issue (see *Huck v. Northern Indiana Public Service Co.* (1983), 117 Ill. App. 3d 837, 840, 453 N.E.2d 1365, 1369), we find the reasoning and analysis of the *Bailey* court to be persuasive. Additionally, we note that the fifth district of our court in *Ritzheimer v. Insurance Counselors, Inc.* (1988), 173 Ill. App. 3d 953, 527 N.E.2d 1281, has concluded, albeit in *dictum*, that an independent, common law claim for intentional infliction of emotional distress is not barred by the Human Rights Act. (*Ritzheimer*, 173 Ill. App. 3d at 964, 527 N.E.2d at 1289.) In *Ritzheimer*, plaintiff claimed both sex discrimination based on a violation of article I, section 17, of the Illinois Constitution (Ill. Const. 1970, art I, §17) and intentional infliction of emotional distress arising out of conduct occurring during her employment with Insurance Counselors, Inc. Though resolving the case on the basis of the sex discrimination claim, the *Ritzheimer* court noted the following distinction between plaintiff's emotional distress claim and a civil rights violation:

> "While claims for 'civil rights violations' based on sex discrimination must be brought pursuant to the Illinois Human Rights Act where the Act applies, *** intentional infliction of emotional distress is a common law tort theory, not a 'civil rights violation' as defined by the Act, and does not depend on the policies or provisions of the Act for its viability. To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege facts which, if true, would establish that

conduct by defendant was extreme and outrageous, that the emotional distress suffered by the plaintiff was severe, and that the defendant acted either intentionally to cause distress or with knowledge of the fact that severe emotional distress would be certain or substantially certain to result. [Citation.] These elements are quite different from those necessary to establish a 'civil rights violation' under the Act, and they may be present even where a 'civil rights violation' based on sex discrimination cannot be shown." (*Ritzheimer*, 173 Ill. App. 3d at 963-64, 527 N.E.2d at 1288.)

On the basis of *Bailey* and *Ritzheimer*, we thus find that the trial court had jurisdiction to consider Kaferly's intentional infliction of emotional distress claim.

■ Additionally, although not raised by the parties, there appears to be another basis for finding that the trial court had jurisdiction to consider Kaferly's claim. The discrimination provisions of the Illinois Human Rights Act apply only to employers of "15 or more employees *** during 20 or more calendar weeks within the calendar year of or preceding the alleged violation." (Ill. Rev. Stat. 1987, ch. 68, par. 2—101(B)(1)(a).) The record in the present case discloses that when Kaferly worked for Pavilon, there were no more than two persons working in the office with Pavilon. When Pavilon wrote to the Illinois Attorney General's office, complaining of Kaferly's new employer, he referred to his business as a sole proprietorship. Also, during closing argument to the jury, Pavilon himself referred to his enterprise as a small business with six employees. If, in fact, he was not an employer with the requisite number of employees required under the Human Rights Act, then the trial court's jurisdiction would not be limited to any extent by the Act.

■ In support of his argument, Pavilon relies upon *Anderson v. Pistner* (1986), 148 Ill. App. 3d 616, 499 N.E.2d 566, a case where the appellate court upheld the dismissal on jurisdictional grounds of tortious interference with contractual relations and prospective business advantage claims on the basis that they were nothing more than age discrimination claims. The *Anderson* case is distinguishable from the present case because although the complaint in *Anderson* alleged tortious interference theories, it started out as an age discrimination claim and, even though it was later amended, it never exceeded the bounds of an age discrimination case. The nature of the conduct complained of in the present case, however, goes far beyond the parameters of a discrimination claim based on sexual harassment and extends after the employment relationship was terminated. Thus, Kaferly's

claim for intentional infliction of emotional distress, unlike the claims asserted in *Anderson*, may not be construed as merely "a veiled attempt to assert a 'civil rights violation.' " (*Ritzheimer*, 173 Ill. App. 3d at 964, 527 N.E.2d at 1289.) Moreover, even if not otherwise distinguishable from *Anderson*, Pavilon, unlike the employer in *Anderson*, did not have the requisite number of employees to fall within the Human Rights Act.

■ Notwithstanding the resolution of the jurisdictional argument, Pavilon contends Kaferly failed to prove the merits of her claim for intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress, a plaintiff needs to show:

> "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress." (Emphasis in original.) (*McGrath v. Fahey* (1988), 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809.)

Liability has been found only where the conduct complained of was found to be so outrageous "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Restatement (Second) of Torts §46, comment *d*, at 73 (1965); accord *McGrath*, 126 Ill. 2d 78, 533 N.E.2d 806; *Milton v. Illinois Bell Telephone Co.* (1981), 101 Ill. App. 3d 75, 427 N.E.2d 829.) While acknowledging this standard, we find that there is sufficient proof in the record to support Kaferly's claim.

■ A jury reasonably could have found that Pavilon's specific acts as well as his cumulative pattern of conduct toward Kaferly, commencing while she was still his employee and continuing long after he fired her, constituted extreme and outrageous conduct. While his employee, he began to pressure her for dates and ultimately persisted on numerous occasions to offer her money in return for sexual favors. To a woman of ordinary morality and sensibilities, the offensive manner and sinister persistency of such sexual pursuit can be perceived to rise to the level of conduct which is "truly extreme and outrageous." The impact of such outrageous conduct is exacerbated where, as here, the offender was also the employer of the the victim. (See *McGrath v. Fahey* (1988), 126 Ill. 2d 78, 86-87, 533 N.E.2d 806, 809 (stating: "[t]he more control which a defendant has over the plaintiff, the more likely that *** conduct will be deemed outrageous").) In an employment context, the coercive pressure upon an employee to accede to the unacceptable demands and insults of the employer is greatly in-

tensified by the implied threat of job loss or job erosion in the event of noncompliance. In *Milton v. Illinois Bell Telephone Co.* (1981), 101 Ill. App. 3d 75, 427 N.E.2d 829, we held that a cause of action for intentional infliction of emotional distress was properly stated under circumstances where an employer allegedly engaged in an extensive course of disciplinary and harassing conduct to coerce the plaintiff to falsify work reports. Quoting from Dean Prosser, we noted that such conduct was very much " 'like extortion.' " (*Milton*, 101 Ill. App. 3d at 79, 427 N.E.2d at 832, quoting from Prosser on Torts §56 (4th ed. 1971).) Though not of the same nature as the conduct alleged in *Milton*, coercion to date and engage in unwanted sex is similarly extortive and outrageous.

This pattern of harassment and abuse continued and expanded after Pavilon fired Kaferly. There is testimony, albeit without further details or elaboration, that thereafter, Pavilon continued to harass Kaferly, her parents and her psychotherapist with unsolicited letters and attempted to disrupt her employment relationship by harassing her new employer with early morning telephone calls and a spurious complaint and by attempting to preempt her employer's trademark. On a more ominous note, she testified, again without detailed elaboration, that after Pavilon fired her, he variously threatened to kill her, rape her and even to file a lawsuit challenging her rights to the custody of her only child. Additionally, on one occasion, he renewed his money for sex proposition and brazenly signed a note attesting to that proposition.

Cumulatively, this testimony concerning Pavilon's conduct towards Kaferly commencing with her employment and continuing thereafter could support a finding that it was outrageous enough to satisfy the Restatement standard previously quoted herein. (Restatement (Second) of Torts §46, comment *d* (1965).) This characterization of Pavilon's conduct throughout this time period is further supported by the fact that it was directed at a person whom he clearly knew to be susceptible to emotional distress. Conduct which might not ordinarily be actionable may be considered outrageous if the defendant knows that a plaintiff is particularly susceptible to emotional distress. (*McGrath v. Fahey* (1988), 126 Ill. 2d 78, 90, 533 N.E.2d 806, 811; *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 94, 360 N.E.2d 765, 769.) In *McGrath v. Fahey* (1988), 126 Ill. 2d 78, 533 N.E.2d 806, our supreme court found that a defendant bank's continued wrongful refusals to release money to a plaintiff whom it knew to be susceptible to heart disease to be significant in determining whether that conduct was outrageous. Similarly, in the present case, we find the fact that Pavilon persisted in his conduct toward Kaferly, a person he

knew to be undergoing psychotherapy, to be a significant factor.

A jury also reasonably could have found that Pavilon knew that there was a high probability that his conduct would inflict severe emotional distress on Kaferly. This would be a reasonable inference from the evidence of his initial close relationship with Kaferly, the knowledge that he derived from that relationship that she was undergoing psychotherapy, and the fact that he himself was a trained psychotherapist. And, a jury reasonably could have found support for a conclusion that Pavilon's conduct actually caused severe emotional distress to Kaferly from Kaferly's testimony that she was forced to continue her psychotherapy treatment and Gluck's testimony corroborating this need to continue psychotherapy and describing her as being scared, angry, and unable to cope with her child, her work and her relationship with men generally as a result of these problems. Furthermore, the duration of this continuing therapy provides added support for the severity of the distress. (*McGrath*, 126 Ill. 2d at 86, 533 N.E.2d at 809; *Public Finance Corp.*, 66 Ill. 2d at 90, 360 N.E.2d at 767.) Both Kaferly and Gluck testified that she was still in therapy as of the date of their testimony in the trial court proceeding.

Pavilon's next contention is that Kaferly failed to present sufficient evidence supporting her claim for conversion of her desk. Specifically, he argues that she failed to present sufficient evidence that she held a property interest in the desk or that she made a demand for the return of the desk.

The evidence presented to support the conversion claim was brief. It consisted largely of Kaferly's testimony on the subject. She testified that Pavilon refused to let her remove a desk which he had given to her and which she used while she was working for him. When Kaferly originally received the desk, she paid to have it refinished. She also testified that the refinisher told her that it was worth $2,000, which was hearsay but was not objected to. After Kaferly was terminated, she tried to remove the desk but Pavilon refused to let her take it, claiming that he would not permit her to take it until she paid him what she owed him. Thereafter, she learned from his deposition testimony that he had sold the desk for $500.

■■■ We find that there was sufficient evidence to support the claim for conversion of Kaferly's desk. To prove a claim for conversion, a party must show: (1) a right in the property; (2) a right to the immediate possession of the property which is absolute and unconditional; (3) a deprivation of the right by the unauthorized and wrongful assumption of control, dominion, or ownership by a defendant; and (4) a demand for possession of the property. (*Glaser v. Kazak* (1988), 173

Ill. App. 3d 108, 115, 527 N.E.2d 379, 383.) Kaferly's unrebutted testimony that the desk was a gift to her from Pavilon satisfies the requirements that she have a right of ownership in the desk with a right to its immediate possession. A gift by definition is the absolute and irrevocable transfer of title to property from a donor to a donee. (*Pocius v. Fleck* (1958), 13 Ill. 2d 420, 427, 150 N.E.2d 106, 111.) Pavilon himself confirmed that it was a gift when, in his closing argument, he stated: "The desk in question was a gift. I'm being honest. I could said [*sic*], no, I don't know anything about it. It was a gift." Also, Kaferly's testimony that Pavilon refused to permit her removal of the desk after her termination and her further testimony that he admitted at his deposition that he sold the desk and kept the proceeds sufficiently demonstrated Pavilon's unauthorized assumption of control over the desk. Though Pavilon argues that the evidence is devoid of proof of a "demand" for the return of the desk, we find the unrebutted testimony that he refused to allow Kaferly to remove the desk to sufficiently imply that she made a demand for it. Moreover, a demand is unnecessary to establish a conversion where another independent action of conversion is established. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 933, 419 N.E.2d 578, 593.) The unrebutted testimony that Pavilon sold the desk for $500 would appear to constitute such an independent act. *Jensen*, 94 Ill. App. 3d 915, 419 N.E.2d 758.

Pavilon next contends that Kaferly failed to present sufficient evidence that he defamed her by "publishing" false reports that she was misrepresenting the solids content of a floor finish product she was selling for Pavilon's competitor. He argues that Kaferly failed to prove a publication of any defamatory material. Kaferly, on the other hand, argues that there was sufficient proof that Pavilon adulterated the floor finish product and then published the false solids content of the product to Scribner & Company, which was her customer, the lab employees who tested the adulterated product, and the Illinois Attorney General's office.

The evidence which was presented on the defamation claim included Pavilon's testimony that he opened a container of the floor finish product, poured a sample of the product into a bottle and then had it tested by a laboratory for its solids content. He stated that when he received the results, showing a solids content which was less than Kaferly's employer claimed for the product, he mailed a copy of the report to Kaferly with his notation, "Roxana—when are you going to admit to yourself that the guy is a liar and a cheat?" Kaferly testified that when she received the report, she took a different container of

the same product to the same laboratory and obtained a result of a higher solids content. There was no specific evidence that Pavilon adulterated the sample, and there was no evidence that Pavilon's laboratory report had been sent to anyone but Kaferly. Pavilon himself did question Kaferly regarding a possibly defamatory letter mailed to Scribner & Company, Kaferly's customer, but the record shows that Kaferly's attorney rejected this letter as the basis for her defamation claim, thus leaving the record devoid of any evidence that it had been sent to anyone but Kaferly. The record does contain a letter to the Illinois Attorney General's office complaining of Kaferly's employer's false representation of the solids content of the floor finish product, but the letter contains no reference or charges concerning Kaferly.

 We find the evidence insufficient to support Kaferly's defamation claim. "A defamation is the publication of anything injurious to the good name or reputation of another, or which tends to bring him or her into disrepute." (*Marczak v. Drexel National Bank* (1989), 186 Ill. App. 3d 640, 644, 542 N.E.2d 787, 789.) The record discloses that Pavilon took a sample of Kaferly's employer's product to a laboratory for testing and then sent the report with a handwritten note critical of Kaferly's employer to her. Even if defamatory, the mailing of such a report to the person claiming the injury would not constitute a publication. (See *Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center* (1985), 137 Ill. App. 3d 294, 300-01, 484 N.E.2d 841, 845.) Also, contrary to Kaferly, neither the submission of the product sample to the laboratory nor the filing of a complaint with the Illinois Attorney General's office constituted a publication defamatory to her because there is no evidence that any reference or attribution was made to her in the sample of the complaint. Since there was no apparent evidence that either was defamatory to Kaferly, we need not consider the questions whether either constituted a publication and, if so, whether any defense to a publication, such as the defense of qualified privilege, was applicable.

 Even though we find that the evidence does not support the defamation claim, such a finding does not by itself warrant a reversal of this matter. As indicated, the jury returned a general verdict in Kaferly's favor, and the trial court, after reducing damages, entered judgment on that verdict. A general verdict on several counts will not be reversed or set aside if at least one of those counts is sufficient to support the verdict "unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1201(d); see

*Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 412 N.E.2d 447.) Thus, a reversal is only warranted if the verdict is not supportable by one of the sustained counts or that Pavilon made a motion to withdraw the defamation count from the jury when the denial of such a motion would have been prejudicial.

▬ As previously indicated, there was sufficient evidence in the record for the jury to have found in Kaferly's favor with respect to her intentional infliction of emotional distress and conversion counts. Additionally, we note that Pavilon failed to move to withdraw the defamation count from the jury on account of insufficiency of evidence and also failed to object to the instruction on defamation, which was given to the jury. Moreover, even though Pavilon could have requested separate verdicts on each count (Ill. Rev. Stat. 1987, ch. 110, par. 2—1201(c)), he failed to do so. Under such circumstances, he cannot now successfully argue that this court must presume that the verdict was based on the defamation count. See *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294, 263 N.E.2d 103, 106.

Since we have found there was sufficient evidence to support the verdict in this case and Pavilon made no motion to withdraw the defamation claim from the jury on grounds of insufficient evidence, a reversal is not warranted.

CONDUCT OF TRIAL

Pavilon contends that he was denied a fair trial because of certain conduct and remarks of the trial judge occurring in the presence of the jury. He argues that the judge's conduct and remarks demonstrated an antagonistic attitude towards him which prejudiced him in the minds of the jury.

Pavilon chose to represent himself in the trial of this matter. Even under the best of circumstances, the conduct of a trial involving a *pro se* litigant presents enormous difficulties for any trial judge. (See generally, Rubin, *The Civil Pro Se Litigant v. The Legal System*, 20 Loy. U. Chi. L.J. 999 (1989).) As noted in *Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 466 N.E.2d 658:

> "The heavy responsibility of ensuring a fair trial in such a situation rests directly on the trial judge. The buck stops there. There is no law that requires a litigant to have a lawyer. The lawyer for the opposing side cannot be expected to advise the opposing party who is *pro se*. The judge cannot presume to represent the *pro se* party. In order that the trial proceed with fairness, however, the judge finds that he must explain matters

that would normally not require explanation and must point out rules and procedures that would normally not require pointing out. Such an undertaking requires patience, skill and understanding on the part of the trial judge with an overriding view of a fair trial for both sides." (*Oko,* 125 Ill. App. 3d at 723, 466 N.E.2d at 661.)

This case did present many of these typical difficulties for the trial judge. Although Pavilon was not necessarily the typical *pro se* litigant, having at one time been a law student, he did have constant difficulty in presenting evidence. As a result, the trial judge had to explain many matters that would not normally require explanation and to point out rules and procedures that would not normally require such elucidation. Additional difficulties were created for the trial judge because Pavilon was a particularly intractable litigant. Throughout the course of the trial, Pavilon either persistently misstated evidence or injected his own version of evidence into his questions or arguments and repeatedly defied the court's admonishments against such conduct. On one occasion, during a sidebar conference, the trial judge stated that the trial proceeding was "on the brink of a circus" as a result of Pavilon's conduct. He later found Pavilon in contempt for this conduct and assessed a $450 fine, from which, incidentally, Pavilon has not perfected an appeal.

■■ Generally, a trial judge should be afforded a wide latitude in his or her conduct of a trial. (*Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 685, 455 N.E.2d 232, 238.) A judge's conduct and remarks in the presence of a jury will not warrant a reversal unless they are such as would ordinarily create prejudice in the minds of the jurors. (*Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 723, 466 N.E.2d 658, 660.) Notwithstanding the severe difficulties generated by the intractable and contemptuous manner in which Pavilon represented himself in this case, we nevertheless must find that certain conduct and remarks of the trial judge during the course of this jury trial cumulatively were such as would ordinarily create a prejudice against Pavilon in the minds of the jury and cannot be fully condoned or justified by the provocative and contumacious behavior of Pavilon.

Pavilon cites to a number of instances of improper conduct or remarks by the trial judge, but we need address only a few for our disposition of this appeal.

Pavilon claims that the trial judge's own numerous objections to questions which Pavilon was asking of witnesses were improper. A fairly typical example of these objections occurred during Pavilon's

examination of Theodore Gluck, Kaferly's psychotherapist, when the following transpired:

> "MR. PAVILON: Are you aware of the romantic relationship that Roxana Kaferly and myself experienced and enjoyed for—
>
> THE COURT: Just a minute. There is no evidence that she experienced anything like that or enjoyed it. The jury is asked to disregard that. There is no evidence at all or basis for that question."

The trial judge interposed other similar objections on his own initiative to questions being asked by Pavilon throughout the course of the trial where no objection was raised by Kaferly's counsel.

■■■ We find that the trial judge's numerous interpositions of his own objections were improper. When a case is being tried before a jury, a trial judge should not by his conduct or remarks either indicate his favor or disfavor towards any of the parties or his opinion on the evidence. (See *County of Cook v. Colonial Oil Corp.* (1958), 15 Ill. 2d 67, 153 N.E.2d 844.) At times, a trial judge might on his own initiative object to questions in order to have the matter proceed in a proper manner (*County of Cook*, 15 Ill. 2d at 72, 153 N.E.2d at 847), but such objections should be narrowly limited to avoid an appearance of partisanship. In the present case, the judge's frequent interpositions of his own objections created a substantial risk of being perceived to favor one position over the other. While the trial judge may well have intended simply to keep the *pro se* litigant from unfairly skewing the evidence in his favor with irrelevancies and half-truths, he made it more likely that the frequency and manner of his objections would be interpreted as those of an advocate for Kaferly and not an impartial arbiter of the dispute. (See *In re R.S.* (1983), 117 Ill. App. 3d 698, 704-05, 453 N.E.2d 139, 143.) Though in *pro se* litigation it may be more condonable for a trial judge to interpose his own objections to questions asked by the attorney representing the other side in order to ensure a fair trial to the *pro se* party (see *Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 511, 394 N.E.2d 1273, 1281), objections to questions asked by the *pro se* litigant cannot be similarly justified because there is a far lesser need to protect the interests of the party who is represented by counsel.

■■ Even if a trial judge's frequent objections do not create an appearance of partisanship, they could be perceived as comment upon the weight or credibility of the evidence. Such a perception may be engendered both by the fact that the trial judge has in fact objected to the evidence in question as well as by the manner in which that

objection is articulated. By commenting on evidence, the trial judge improperly usurps the role of the jury. See *Bebb v. Yellow Cab Co.* (1970), 120 Ill. App. 2d 454, 466, 257 N.E.2d 164, 170.

Pavilon next claims that the trial court's frequent criticism of him in the presence of the jury prejudiced him in their eyes. He refers to a number of instances of such criticisms but a reference to three of them will suffice to demonstrate his point. On one occasion, when Pavilon attempted to improperly show a witness a document, the trial judge and Pavilon engaged in a discussion which ultimately culminated in the judge's issuing the following warning to Pavilon:

> "Don't try to sneak these things in. You may not sneak out of this building. You go on to the next one. That's totally irrelevant."

On another occasion, when Pavilon persisted in an improper line of questioning of Kaferly, the following occurred:

> "THE COURT: Just a minute. You're giving us an argument. I want to tell you right now, I just sent for two deputy sheriffs. You're going to have to be restrained. For some reason or another, you cannot or will not control your propensity for trying to fool this Court and jury; and I want you to fully understand that I will not sit still for this. She didn't say that, and you're arguing your case in every other question. I told you that will stop, but apparently it doesn't. I'm going to have to take some other means to do it. I may stop you from asking any further questions, and you will be out.
>
> MR. PAVILON: I'm sorry.
>
> THE COURT: Your apologies are not sincere and you don't mean them.
>
> MR. PAVILON: I am not a lawyer, your Honor.
>
> THE COURT: Don't hide behind that. You had four lawyers. You had every opportunity to get counsel. You had counsel. They left you. And that's the record here. You ask questions, and I don't want any sermons or arguments in the form of a question. Proceed."

On a third occasion, when Pavilon asked the trial judge if he could discuss a problem with him, the judge commented:

> "THE COURT: You always have problems. You've been giving me nothing but problems since we started this case."

█ We find that the trial judge's frequent personal admonitions of Pavilon, occurring as they did in the presence of the jury, were excessive. It is improper for a judge to unduly criticize a party or its counsel in such a manner as to show a bias against or hostility to-

wards a party. (*People v. Kelley* (1963), 29 Ill. 2d 53, 193 N.E.2d 21; *People v. Lewerenz* (1962), 24 Ill. 2d 295, 181 N.E.2d 99.) Although a trial judge has the power to admonish or rebuke a party or counsel for misconduct and may, when reasonably warranted, do so in the presence of the jury, any rebuke in the presence of the jury should not exceed the bounds of necessity and care must be taken even then to admonish in a manner which will not deprive either party of a fair trial. See *Kelley*, 29 Ill. 2d 53, 193 N.E.2d 21; *Lewerenz*, 24 Ill. 2d 295, 181 N.E.2d 99.

A case such as this presents a serious dilemma for a trial judge. On the one hand, a trial judge is charged with the responsibility to maintain order and to ensure compliance of the parties with the rules of evidence and procedure. On the other hand, a trial judge is charged with the duty to avoid influencing the jurors as the triers of fact in their factual determinations and to maintain, in fact and in appearance, complete neutrality and objectivity. Where a party is persistently disruptive and contemptuous of the rules of conduct, the trial judge's function to coordinate between his responsibilities to police on the one hand and maintain the appearance of neutrality on the other becomes intensely difficult, but not necessarily impossible. This dilemma was addressed by the United States Court of Appeals in *United States v. Dellinger* (7th Cir. 1972), 472 F. 2d 340. There, the court stated:

"[T]he judge [has] the duty to *** admonish, or take other appropriate action in accordance with his judgment of propriety and necessity. There must be reasonable latitude with respect to the manner in which these duties are performed.

On the other hand, there are high standards for the conduct of judges *** and impropriety by persons before the court does not give license to depart from those standards.

The trial judge's behavior must not preclude 'that atmosphere of austerity *** which is indispensable for an appropriate sense of responsibility on the part of the court, counsel and jury.' [*Offutt v. United States* (1954), 348 U.S. 11, 17, 99 L. Ed. 11, 18, 75 S. Ct. 11, 15.] Judicial comments in the presence of the jury are subject to special scrutiny because of the recognized fact that 'the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.' [*Starr v. United States* (1894), 153 U.S. 614, 626, 38 L. Ed. 841, 846, 14 S. Ct. 919, 923.] Cautionary instructions do not cure a comment 'of a sort most likely to remain firmly

lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence.' " (*Dellinger*, 472 F. 2d at 386, quoting *Quercia v. United States* (1933), 289 U.S. 466, 472, 77 L. Ed. 1321, 1326, 53 S. Ct. 698, 700.)

Many times in the present case, the trial judge did deploy various appropriate means to control Pavilon's frequent misconduct. On occasion, he conducted sidebars, recessed the jury, and even exercised his contempt power against Pavilon outside the presence of the jury. Also, on other occasions, he admonished Pavilon in the presence of the jury in a manner which was clearly appropriate for the circumstances. Too often, however, he admonished Pavilon in front of the jury in a manner which could be perceived as demonstrating a personal hostility toward him. The examples set forth above are representative of other such admonitions. Though many admonitions were provided and necessitated by Pavilon's misconduct, we cannot say that they were measured responses appropriate to such conduct. Occurring as often as they did in the presence of the jury and indicating a hostility towards Pavilon, they were excessive and apt to improperly influence the jurors in their verdict. *People v. Kelley* (1963), 29 Ill. 2d 53, 60, 193 N.E.2d 21, 25.

Pavilon next claims that the trial judge improperly rephrased and embellished Kaferly's testimony by stating that one of her allegations was that Pavilon attempted to rape her. During Pavilon's examination of a witness, Kaferly's counsel objected to one of his questions and the following discussion occurred.

> "THE COURT: The allegations in this case is [*sic*] that you attempted to rape her, that you upset her when she was under therapy.
>
> MR. PAVILON: That's not an allegation that I attempted to rape her.
>
> THE COURT: That's her testimony under oath in this courtroom."

Pavilon asserts that there was no basis in the evidence for these statements by the trial judge.

We find that the trial judge did misconstrue Kaferly's testimony on this point. Kaferly testified that when she met with Pavilon in a restaurant after her termination, he told her that on the date of her termination, he had *wanted* to rape her and that he still *wanted* to rape her. She further testified that on another unspecified occasion, he *threatened* to rape her. Though a desire and a threat to rape someone are reprehensible conduct, neither amounts to an *attempt*. At this

point in the litigation, we do not know what effect the difference between a desire or threat to rape and an attempt to rape had on the jury's ultimate decision. Nonetheless, whenever a trial judge misconstrues the testimony of a witness, it is error. See *Gabosch v. Tullman* (1974), 21 Ill. App. 3d 908, 316 N.E.2d 226.

Lastly, we consider Pavilon's contention that the trial judge improperly criticized one of his witnesses. During direct examination of the witness, Kaferly's counsel asked the judge to instruct the witness to only answer the question posed. The trial judge then advised the witness as follows:

> "We know where your sentiments lie. I don't expect you to burnish up your answers so that they affect one side or another. You just give us the facts. I don't care to have you add things that are not asked of you because you think they may help your friend."

Later, during cross-examination of that same witness, when Pavilon made an objection to a question being asked, the trial judge told the witness to be quiet because "[y]our friend made an objection."

Though the trial judge had a basis for concluding that this witness was Pavilon's friend, these comments were clearly improper because they conveyed the trial judge's assessment of the witness' credibility. (See *Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 663, 315 N.E.2d 63, 69.) By making these comments, the trial judge invaded the province of the jury and could have influenced the jury's assessment of the witness and the credibility of his testimony. *Taylor v. Carborundum Co.* (1969), 107 Ill. App. 2d 12, 26-27, 246 N.E.2d 898, 905-06.

We find that cumulatively the conduct of the trial judge, as reflected in the record, was sufficient to create prejudice in the minds of a jury. No matter how well intentioned the judge's conduct and remarks might have been, his interventions and his comments on the evidence were sufficient to create a likelihood of prejudice to Pavilon. (See *People v. Moriarity* (1966), 33 Ill. 2d 606, 213 N.E.2d 516.) We cannot say that a perception among the jurors that the trial judge may have disfavored one of the litigants would have had no effect on the outcome. (See *Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 214, 488 N.E.2d 672, 676.) As noted in our discussion of the evidence on the various causes of action, the testimony often was conclusory with very little elaboration. Though we found the evidence to be sufficient to support the verdict, we cannot say that the jury was not influenced by these perceptions. The fact that the trial judge recognized the verdict to be excessive and attempted to remove the ex-

cess by remittitur further corroborates the likelihood that the jury was swayed by passion or prejudice.

Kaferly does not respond directly to Pavilon's specific contentions concerning the prejudicial impact of the conduct and remarks of the trial judge. Instead, she argues that Pavilon should be precluded from pursuing this appeal because he has not paid the fine assessed against him when he was adjudicated in contempt of court as a result of his misconduct at trial. As support, she cites to several cases (*e.g., Wick v. Wick* (1960), 19 Ill. 2d 457, 167 N.E.2d 207; *Garrett v. Garrett* (1930), 341 Ill. 232, 173 N.E. 107) which, she claims, stand for the proposition that a party who has refused to obey the mandate of the court and who has been adjudged in contempt is not entitled to prosecute or defend an action.

■■ The cases cited by Kaferly are not on point. In *Wick v. Wick* (1960), 19 Ill. 2d 457, 167 N.E.2d 207, a divorced wife filed a petition seeking to have her divorced husband held in contempt for failing to pay court ordered child support. The divorced husband, who had been paying the support into bank accounts set up for his children, argued that since his wife was in violation of a court ordered custody provision, having removed the children from the county, she could not be heard to seek enforcement of the support order. Our supreme court agreed with the husband, setting forth the general principle:

> "[A] party who refuses to obey the mandate of the court, and who has been adjudged in contempt for such refusal, is not entitled to prosecute or defend an action when the nature of the contempt is such as to hinder and embarrass the due course of procedure in the cause." (*Wick*, 19 Ill. 2d at 459, 167 N.E.2d at 209.)

Similarly, in *Garrett v. Garrett* (1930), 341 Ill. 232, 173 N.E. 107, our supreme court held that a divorced husband who had been held in contempt for failing to comply with a court order to pay alimony, solicitor's fees and court costs and who had not purged that contempt should not receive any consideration in his appeal from that order.

■■ The present case is different from both the *Wick* and *Garrett* cases in that Pavilon is not in contempt of the judgment of the trial court, awarding $50,750 in damages to Kaferly. The record discloses that he has obtained a stay of enforcement of that judgment and posted an appropriate bond. Thus, he is not appealing from a judgment which he is simultaneously defying. Additionally, there is no record support for Kaferly's claim that Pavilon has not yet paid his fine. Even if the record supported Kaferly's claim that Pavilon has not yet paid his contempt fine, the question whether he has paid the

fine does not under *Wick* or *Garrett* have any bearing on whether we should consider his appeal. The crucial question under those authorities is whether the nature of the contempt is such as to embarrass or hinder the due course of procedure in the case before the court. Here, even if Pavilon has not yet paid the fine, that would not hinder the progress of this appeal which, as previously stated, is from the judgment, awarding $50,750, the enforcement of which he has properly stayed, and not the contempt order.

We need not reach the remaining issues raised by this appeal since they are unnecessary for our disposition.

For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand this matter for a new trial.

Reversed and remanded.

COCCIA, P.J., and MURRAY, J., concur.