In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2346

FRED HONAKER,

Plaintiff-Appellant,

v.

GARY SMITH, Mayor, individually
and as Mayor of the Village of
Lovington and as Fire Chief
of the Lovington Fire Department,

Defendant-Appellee.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98 C 2099--Michael P. McCuskey, Judge.

ARGUED DECEMBER 8, 2000--DECIDED June 26, 2001

Before FLAUM, Chief Judge, and RIPPLE and
EVANS, Circuit Judges.

RIPPLE, Circuit Judge. Fred Honaker filed
a complaint against Gary Smith, the Mayor
and Fire Chief of the Village of
Lovington, Illinois ("the Village"),
regarding the events surrounding a fire
that consumed Mr. Honaker's house in
Lovington. Two counts of the complaint,
as amended, are before us on this appeal.
In Count I, the complaint maintained that
Mr. Smith, in his official capacity and
under color of state law, had violated
Mr. Honaker's rights under 42 U.S.C. sec.
1983 ("Section 1983") by causing the fire
that burned down Mr. Honaker's house.
Count I also alleged that Mr. Smith, in
his role as the Village's Fire
Chief,violated Mr. Honaker's rights under
Section 1983 by failing to use his best
efforts to extinguish that fire. Count IV
of the complaint consisted of an Illinois
common law claim against Mr. Smith,
alleging the intentional infliction of
emotional distress. At the close of all
of the evidence, the district court
granted Mr. Smith judgment as a matter of
law on the intentional infliction of
emotional distress claim. A jury returned
a verdict for Mr. Honaker in the amount
of $45,000 on the Section 1983 claims;

however, the district court then entered judgment as a matter of law notwithstanding the verdict on that count in favor of Mr. Smith. For the reasons set forth in the following opinion, we affirm the judgment of the district court regarding Mr. Honaker's claims under Section 1983. We reverse and remand with respect to the intentional infliction of emotional distress claim.

I

BACKGROUND

A. Facts

Mr. Honaker owned a house in Lovington that was not his primary residence, but where he would occasionally stay overnight. The utilities were kept on in the house, though the gas and electricity were not activated. Mr. Honaker had begun extensive remodeling on the house including the removal of an interior wall. Because of this ongoing construction, the house was in very poor condition.

Mr. Honaker earned a living by rebuilding pallets/1 on the property where this house was located. As a consequence of that business, wood and other debris were often strewn around the property. Despite the fact that building pallets often creates a great deal of noise, Mr. Honaker kept unusual hours in his work and would occasionally toil into the early morning. Residents often complained about the state of the property to Lovington's City Council, and Mr. Honaker received citations from local police officers due to the property's poor condition. One resident in particular, Mr. Honaker's neighbor Ed Crafton, had a long-running feud with Mr. Honaker. Crafton made a number of formal and informal complaints regarding the noise emanating from Mr. Honaker's property and the physical state of that property to members of the Village government. Members of the City Council often discussed these complaints and expressed their displeasure with the property's condition. As mayor, Mr. Smith was a member of the City Council.

Mr. Honaker had an acrimonious history with the Village. He had filed a civil rights suit against it in 1995, which was

settled the next year. Village personnel also often made derogatory comments to him about the state of his property. Moreover, Mr. Honaker testified that, at some point near Thanksgiving in 1996, he had a rancorous encounter with Mr. Smith outside of a local bar. Mr. Honaker claimed that, on that occasion, Mr. Smith approached him and "told [him] to get [his] stuff and get out of town. . . . [or Mr. Smith would] burn [him] out." R.70 at 76. Mr. Honaker asserted that he told his lawyer about this threat immediately, but did not report it to any law enforcement agency. Mr. Smith denies that the conversation ever took place.

On the night of March 1, 1997, Mr. Honaker's house caught fire. The Village's volunteer Fire Department responded to the call regarding the fire, which came in at 1:51 a.m., within minutes. In total, four fire trucks and twenty volunteer firefighters from the Fire Department arrived at the scene. Additionally, one fire truck and several firefighters were called in from the neighboring Sullivan, Illinois, Fire Department to help extinguish the blaze. As the Village's Fire Chief, Mr. Smith arrived at the scene soon after the call and led the fighting of the fire. He immediately determined that the house's structure was already badly damaged and noticed that a number of floor joists and beams supporting the second floor were cracked and bowed. As a result, Mr. Smith decided that the firefighters should not enter the house to battle the fire because the house's structure was too unstable to risk such entry./2 After three hours the fire was extinguished; however, it rekindled twice during that day, requiring the firefighters to return each time to quench the flames.

Don Tankersly, an investigator from the Illinois State Fire Marshall's Office, arrived at the scene of the fire at 3:30 a.m. He saw the firefighters actively engaged in attempting to put out the fire, and he believed that they were making every effort to extinguish the blaze. He also noticed that ceiling joists from the first floor of the house appeared to be cracking and that the second floor of the house looked to be sagging downward. Tankersly later completed his investigation of the fire and determined that it was set intention

ally, but found no evidence to demonstrate that Mr. Smith or anyone else was specifically responsible for its origin.

Mr. Honaker arrived at his property on the morning of the fire and was visibly upset and distraught; at one point he even began to cry. He was also extremely angry and began yelling and screaming. However, Mr. Honaker did not seek medical treatment at any point for emotional distress that he may have suffered due to the fire.

The Honaker fire was not the first time that dilapidated buildings owned by a Lovington resident had burned down under suspicious circumstances. A few monthsbefore the fire to Mr. Honaker's house, buildings in poor condition that belonged to Lovington resident Tom Brewer also had caught fire. As in Mr. Honaker's case, the poor condition of Brewer's property had been discussed in the City Council before the fire, and the Village had asked Brewer to tear down those buildings. Before Brewer took any action, the buildings burned down, and the cause of that fire never was determined.

After the Honaker fire, a great deal of speculation in the Village focused on its possible cause. Mr. Honaker initially suspected that either Crafton or Mr. Smith was involved in setting the blaze. Additionally, rumors soon spread that Doug Thomas, a member of the Village government and of its Fire Department, may have had a role in starting the conflagration, allegations that Thomas denied. Jokes regarding the fact that Mr. Honaker's house had burned down, not long after many members of the community had expressed displeasure about the state of his property, were also prevalent around the Village and were made by some residents at City Council meetings. Mr. Smith denied taking part in those jokes; he also consistently maintained that he had nothing to do with starting the fire and that he made every effort as fire chief to put the fire out as quickly as possible.

B.  District Court Proceedings

On December 16, 1998, Mr. Honaker filed a First Amended Complaint ("the complaint") in this matter, which alleged

four causes of action against Mr. Smith. Count I maintained that Mr. Smith, in his official capacity as Mayor of Lovington and Fire Chief of the Lovington Fire Department, was liable under Section 1983 for setting the fire at Mr. Honaker's house and for intentionally failing to properly extinguish the fire. Count IV alleged that Mr. Smith was liable under Illinois law for the intentional infliction of emotional distress./3 A jury trial began on February 14, 2000. At the close of all of the evidence, Mr. Smith filed a motion for judgment as a matter of law on all of the claims in the complaint. With regard to Count I's Section 1983 claims, the court took the motion under advisement, but allowed the action to be submitted to the jury. However, the court granted the motion as to Count IV's emotional distress claim. It did so because it found that Mr. Honaker presented "no evidence of emotional distress . . . other than the mere claim that [he] was upset" and "no evidence of any medical treatment . . . [or] any follow-up whatsoever with counseling in any way." R.70 at 418.

After its deliberations, the jury returned a verdict on Count I in favor of Mr. Honaker in the amount of $45,000. Mr. Smith then filed a renewed motion for judgment as a matter of law, and on May 4, 2000, the district court granted that motion and entered judgment as a matter of law notwithstanding the verdict on Count I. The court determined that, as to the claim that Mr. Smith was involved in setting fire to Mr. Honaker's house, there was no evidence to support that assertion because Mr. Honaker had put forward only unsupported speculation and conjecture on that point. It also ruled that, even assuming the evidence was sufficient to support a finding that Mr. Smith had set the fire, there was no evidence that he did so "under color of state law," a requirement of all Section 1983 claims. The court explained that in no way could Mr. Smith's action in setting such a fire relate to the performance of his official duties as mayor because any such action "would have involved sneaking around in the late night or early morning hours with some kind of incendiary material." R.61 at 8. Next, the court determined that no evidence supported Mr. Honaker's claim that Mr. Smith failed to extinguish

properly the fire in his capacity as Lovington Fire Chief. This was because "[e]very witness who testified on this subject at trial . . . stated that the firefighters did everything they could to put out the fire." Id. at 9. Additionally, the court noted that Mr. Honaker presented no evidence to support his assertions that alternative methods should have been used to fight the fire or that the Fire Department should have taken far less time than the three hours it needed to initially extinguish the blaze. As a result, the district court determined that no rational jury could have found in favor of Mr. Honaker on Count I and granted Mr. Smith's motion for judgment as a matter of law on that cause of action.

II

DISCUSSION

Mr. Honaker now appeals the district court's rulings with regard to Count I and Count IV. He alleges that, as to Count I, the district court erred in granting judgment as a matter of law notwithstanding the jury's verdict. He claims that there was sufficient evidence for the jury to have found that Mr. Smith caused Mr. Honaker's house to be set on fire and that he did so under color of state law. He also maintains that he put forward adequate evidence for a jury to find that Mr. Smith failed to use his best efforts to put out the fire in his capacity as Lovington Fire Chief. Additionally, Mr. Honaker asserts that the district court erred in granting judgment as a matter of law on Count IV's intentional infliction of emotional distress claim because sufficient evidence existed to prove the elements of that tort under Illinois law. We shall address each of these arguments in turn.


A.  Mr. Honaker's Section 1983 Claims

With respect to Mr. Honaker's claims in Count I, the district court, pursuant to Federal Rule of Civil Procedure 50 ("Rule 50"), granted Mr. Smith's motion for judgment as a matter of law after the jury had returned a verdict for Mr. Honaker./4 Pursuant to Rule 50, a district court may grant judgment as a matter of law when "there is no legally

sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). We review a district court's grant of judgment as a matter of law de novo. See Massey v. Blue Cross-Blue Shield of Ill., 226 F.3d 922, 924 (7th Cir. 2000); Futrell v. J.I. Case, 38 F.3d 342, 346 (7th Cir. 1994). After a jury has rendered its verdict, we must engage in this review not to determine "whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." Massey, 226 F.3d at 924. In that regard, we must judge whether the evidence in support of the verdict is substantial; the party opposing the motion must have put forward more than a "mere scintilla" of evidence to support that jury verdict. Willis v. Marion County Auditor's Office, 118 F.3d 542, 545 (7th Cir. 1997); see also Futrell, 38 F.3d at 346. In reviewing the totality of the evidence in the record, we draw all inferences in the light most favorable to the party against whom the motion is directed. See Willis, 118 F.3d at 545; Cygnar v. City of Chicago, 865 F.2d 827, 834 (7th Cir. 1989). If, after reviewing all of the evidence in the case, the nonmoving party did not introduce enough evidence to support his claim, then judgment as a matter of law is appropriate. See Massey, 226 F.3d at 924.

1.  Setting the Fire

   Mr. Honaker first contends that there was sufficient evidence for a jury to conclude that Mr. Smith played a role in setting fire to his house. As we have noted, Mr. Honaker's claim in this regard was filed under Section 1983. As a result, he must demonstrate not only that Mr. Smith was in fact involved in setting the fire, but also that Mr. Smith did so "under color of state law" and deprived Mr. Honaker of a federally guaranteed right. See 42 U.S.C. sec. 1983; see also Pickrel v. City of Springfield, 45 F.3d 1115, 1118 (7th Cir. 1995); Hughes v. Meyer, 880 F.2d 967, 971 (7th Cir. 1989) (citing West v. Atkins, 487 U.S. 42 (1988)). We have emphasized that "[n]ot every action by a state official or employee is to be deemed as occurring 'under color' of state law." Hughes, 880 F.2d at 971. Action is taken under color

of state law when it involves a misuse of power, "'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Walker v. Taylorville Corr. Ctr., 129 F.3d 410, 413 (7th Cir. 1997) (quoting West, 487 U.S. at 49); see also Hughes, 880 F.2d at 971. As a result, acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office. See Gibson v. City of Chicago, 910 F.2d 1510, 1516 (7th Cir. 1990); Briscoe v. LaHue, 663 F.2d 713, 721 n.4 (7th Cir. 1981).

In Hughes v. Meyer, 880 F.2d 967, 972 (7th Cir. 1989), for example, we determined that a warden of the Wisconsin Department of Natural Resources did not act under color of state law when he provided local sheriffs with information regarding an alleged criminal act undertaken by the defendants. The warden's authority as an official who en forced the state's game laws did not extend to the general enforcement of state law. See id. Thus, when he provided information regarding the alleged criminal act, he was not doing so by virtue of the authority granted to him by his state employment. See id. In contrast, in Pickrel v. City of Springfield, 45 F.3d 1115, 1116-18 (7th Cir. 1995), we held, in the context of reviewing a motion for dismissal under Federal Rule of Civil Procedure 12(b)(6), that an off-duty police officer could have been acting under color of state law when he arrested the plaintiff after an altercation between the two at a restaurant. We made this determinationbecause the officer, although off-duty, was attired in his police uniform which displayed his badge, was wearing his gun and had his marked squad car parked just outside the restaurant. See id. at 1118. We determined that these facts demonstrated that the officer was acting while displaying signs of state authority and advertising the presence of a state actor to those around him. See id. But see Latuszkin v. City of Chicago, 250 F.3d 502, 505-06 (7th Cir. 2001) (off-duty police officer had not acted under color of state law where disputed action occurred while officer was driving his own car outside of his police

jurisdiction and where there was "no allegation that [the officer] was engaged in police activity, that he displayed any police power, or that he possessed any indicia of his office at the time of the accident").

We agree with the district court's conclusion that, on this record, any action taken by Mr. Smith to cause Mr. Honaker's house to burn to the ground was not effectuated under color of state law. Mr. Honaker does not explain how such an act was related to any official duty or activity of Mr. Smith as Mayor of Lovington or as its Fire Chief./5 Moreover, Mr. Honaker makes no substantive contention that Mr. Smith used the cloak of his authority as mayor or fire chief or any indicia of his office to set such a fire. In one of his briefs, Mr. Honaker appears to suggest that Mr. Smith may have paid Thomas to set the fire. See Appellant's Reply Br. at 4. This allegation is not well-formed and, more importantly, Mr. Honaker again does not explain how such an act would be related in any way to the performance of Mr. Smith's duties as a state officer./6 Under these circum-stances, we agree with the district court that there was no basis upon which a reasonable jury could conclude that Mr. Smith violated Section 1983 by causing Mr. Honaker's house to be set afire.

## 2. Extinguishing the Fire

Mr. Honaker also asserts that the district court erred when it ruled that no reasonable jury could have found that Mr. Smith, in his role as fire chief, failed to extinguish properly the fire at Mr. Honaker's house. After extensively reviewing the evidence in the record, we must agree with the district court's conclusion. The record does not contain a legally sufficient amount of evidence from which a jury reasonably could have inferred that Mr. Smith and the firefighters on the scene used anything less than their best efforts to extinguish the fire.

As an initial matter, the evidence overwhelmingly demonstrated that, after receiving the call informing them of the fire on March 1, 1997, the Lovington Fire Department arrived at Mr. Honaker's house within minutes. Fire Department records show that the call was received at 1:51

a.m. and that the first Lovington fire truck arrived at 1:56 a.m., two more trucks arrived at 1:57 a.m., and a fourth arrived at 2:09 a.m. See Def. Ex.7. Additionally, a number of firefighters corroborated the swift arrival time of the Fire Department./7 Moreover, despite the fact that the fire occurred in the early morning hours, the Fire Department responded with four fire trucks and twenty volunteer firefighters. Pursuant to a "mutual aid" agreement with the neighboring Sullivan Fire Department, which employs paid personnel, the Lovington firefighters also called for assistance from Sullivan. Lovington firefighter Steven Fleming testified that Sullivan would not have responded automatically to a fire in Lovington; instead, the Lovington Fire Department must affirmatively have requested their help. As a result of this call for assistance, Sullivan dispatched, in addition to several firefighters, an aerial fire truck which enables firefighters to direct ladders and water to the upper floors of homes. Lovington's Fire Department did not own this type of truck.

Additionally, all of the testimony at trial suggested that, upon arriving at Mr. Honaker's house, the firefightersconsistently and vigorously fought the fire to the best of their ability. Particularly on point was the testimony of Tankersly, the investigator from the Illinois State Fire Marshall's Office, who was called to the scene to determine the cause of the fire. Tankersly, who had 15 years of experience and who had investigated over 1,000 fires in his career, testified that when he arrived at 3:30 a.m., "[f]irefighters were actively engaged in putting out hot spot fires within the structure." R.70 at 275. He also said that the firefighters had made every effort to put out the fire and that they could not have done anything more than what they did. He also corroborated Mr. Smith's view that structural problems had rendered the house unsafe for entry by firefighters. A number of the firefighters themselves corroborated that the fire had been fought vigorously. They explained that, when they arrived at the scene, they immediately put water on the fire and began actively combating the blaze. See, e.g., id. at 217-20 (testimony of Doug

Thomas); id. at 294-98 (testimony of Harold White); id. at 404-08 (testimony of Mr. Smith). Even James Webb, a neighbor and friend of Mr. Honaker's, testified that, when he first noticed the fire at 2:10 a.m., he saw at least twenty members of the Lovington Fire Department fighting the flames. Mr. Webb's testimony bore witness to the significant scope of firefighters' response when he explained that "I walked outside, and I saw the fire trucks. They were halfway down the block on Railroad Street [the street on which Mr. Honaker's house was located] and almost all the way down the block on Middle Street." Id. at 304.

Mr. Honaker points to three facts to support his assertion that Mr. Smith and the firefighters did not use their best efforts in combating the fire. First, he notes that it initially took the firefighters three hours to conquer the flames, a length of time that he suggests was far too great. Next, he submits that the fact that the firefighters did not enter his house to combat the fire suggests that they did not perform their duties properly. Lastly, he cites a piece of trial testimony in which Mr. Smith made the assertion that he did not let the firefighters enter the house because "that house wasn't worth getting hurt for." Id. at 167. Mr. Honaker claims that this statement demonstrates that Mr. Smith's animus towards him was the reason why the firefighters did not enter the structure.

As to the amount of time that it took to combat the fire, we have already noted that substantial testimony supported the conclusion that the firefighters made every effort to control the blaze and that Tankersly, an experienced fire investigator, testified that there was nothing more that could have been done. On the other hand, as the district court noted, Mr. Honaker presented "no evidence that three hours was too long a time to put out this type of fire." R.61 at 9 (emphasis in original). Mr. Smith had explained that the fire raged for that period of time because the firefighters had difficulty in identifying the proper heat source on which to train their hoses and because the great amount of debris in and around the house made it difficult to quickly develop an entryway through which the water could attack the fire. Mr.

Honaker did nothing to contest this explanation or to suggest that the firefighters lingered unnecessarily at the fire scene. A jury would have no evidentiary basis from which to infer reasonably that the Fire Department took an unreasonable amount of time to extinguish the fire.

Additionally, as to the claim that the firefighters should have entered the house, Mr. Smith explained that he did not allow them to do so due to the precarious nature of the house's structure. Every witness who testified on the subject confirmed that, during and after the fire, the floor joists supporting the second floor of the house were cracked and that the second floor itself was sagging--presenting the serious threat that, if the firefighters had entered the burning building, the house might have collapsed around them. For example, Tankersly noted that, after the fire was extinguished, "the floor joists or the ceiling joists from the first floor were actually starting to crack or sag inward" and agreed that it appeared that the second floor itself was actually sagging. R.70 at 276./8 Even Mr. Honaker agreed that, after the fire, one floor joist was broken and that the second floor was sagging downward. Additionally, overwhelming evidence established that the dwelling was in great disrepair because Mr. Honaker had been in the process of "gutting the inside of the house." Id. at 307. Since he had purchased the house, Mr. Honaker had removed a non-load-bearing wall, had torn the kitchen ceiling out and even had experienced part of the chimney falling down on top of him. Lastly, witnesses with experience in investigating and fighting fires testified that, under the circumstances, it was not improper for the firefighters to combat the flames from outside the building. Tankersly explained that during his investigation, he saw that the collapse of the second floor "shows major cracks beginning to show in the floor joists" and that these cracks "made the structure pretty much unsafe to even be in." Id. at 278. Mr. Smith explained that the classes in which he and the other firefighters were trained taught that a fire should be fought "from the outside in" and that if the structure is in danger of collapse, they should not enter the building. Id.

at 407.

In contrast, no witness, with or without firefighting experience, testified that the Lovington Fire Department should have entered the house under such circumstances. Mr. Honaker argues that, because the frame of the house continued to stand after the fire and because the firefighters later entered the building to hose down fire that had rekindled, the house was not in such precarious condition that the Fire Department could not have entered it when they first arrived. We do not believe that these facts, without more, are sufficient for a reasonable jury to conclude that the firefighters should have entered a burning building that, by all accounts, appeared to be in serious jeopardy of collapsing./9

Ultimately, Lovington's volunteer Fire Department responded to a substantial fire in the early morning hours with four trucks, twenty firefighters and significant assistance from a neighboring fire department. Moreover, not only was substantial evidence presented that the firefighters actively fought the flames with their best efforts, but Mr. Honaker offered no testimony from any witness to demonstrate that the firefighters should have or could have done anything differently. As a result, we must agree with the district court's ruling that there was insufficient evidence for a jury to find that Mr. Smith, in his capacity as Lovington's Fire Chief, failed to fight the fire with his best efforts. Therefore, the district court properly granted judgment as a matter of law on Count I.

B.  Intentional Infliction of Emotional Distress

Mr. Honaker's final contention is that the district court erred when it entered judgment as a matter of law at the close of all of the evidence on Count IV, which alleged an Illinois state law claim of intentional infliction of emotional distress. In ruling, the court explained:

[T]here is no evidence of emotional distress that has been presented in this case other than the mere claim that Mr. Honaker was upset. There is no evidence of any medical treatment, any, any

follow-up whatsoever with counseling in any way. So, as to the argument relative to emotional distress, the Court finds no evidence presented and on that issue will be entering judgment in favor of the defendant.

R.70 at 418. Later, the court reiterated that, although Mr. Honaker produced "some evidence" that he was upset and distraught on the day of the fire, it did not believe that "mere emotional distress [on] the day . . . of the fire with nothing more is sufficient [to sustain a cause of action on this claim]." Id. at 422. Additionally, in its Order after the jury's verdict, the court explained that although Mr. Honaker "testified that he was very upset about the fire . . . he did not seek any treatment for emotional distress." R.61 at 3. For these reasons, the court ruled that "the evidence was insufficient to show that Plaintiff suffered severe emotional distress," and it did not allow the claim to be heard by the jury. Id. at 4. Mr. Honaker asserts that the district court's conclusion in this regard was in error.

We review de novo the district court's decision to grant judgment as a matter of law at the close of all the evidence. See Canedy v. Boardman, 91 F.3d 30, 33 (7th Cir. 1996). The district court may grant judgment as a matter of law in such a circumstance when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1); see also Lane v. Hardee's Food Sys., Inc., 184 F.3d 705, 706 (7th Cir. 1999). The district court may not resolve any conflicts in the testimony nor weigh the evidence, except to the extent of determining whether substantial evidence could support a jury verdict--a merescintilla of evidence will not suffice. See Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1471 (7th Cir. 1993). We shall reverse the district court's judgment "'only if enough evidence exists that might sustain a verdict for the nonmoving party.'" Lane, 184 F.3d at 707 (quoting Continental Bank N.A. v. Modansky, 997 F.2d 309, 312 (7th Cir. 1993)).

The tort of intentional infliction of emotional distress has been recognized in

Illinois since 1961, when the Illinois Supreme Court explained that persons could be liable under the tort only for acts truly "outrageous," that is, an "'unwarranted intrusion . . . calculated to cause severe emotional distress to a person of ordinary sensibilities.'" Knierim v. Izzo, 174 N.E.2d 157, 164 (Ill. 1961) (quoting Slocum v. Food Fair Stores of Fla., 100 So.2d 396 (Fla. 1958)). More recently, in McGrath v. Fahey, 533 N.E.2d 806, 809 (Ill. 1988), the Illinois Supreme Court set forth three requirements necessary to demonstrate the intentional infliction of emotional distress: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress and (3) the conduct must in fact cause severe emotional distress. See id. at 809 (emphasis in original). This tort does not require a contemporaneous physical impact or injury. See Corgan v. Muehling, 574 N.E.2d 602, 609 (Ill. 1991). It is clear, however, that "the tort does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" McGrath, 533 N.E.2d at 809 (quoting Restatement (Second) of Torts sec. 46, cmt. d (1965)). Instead, the conduct must go beyond all bounds of decency and be considered intolerable in a civilized community. See Kolegas v. Heftel Broad. Corp., 607 N.E.2d 201, 211 (Ill. 1992); Campbell v. A.C. Equip. Servs. Corp., Inc., 610 N.E.2d 745, 749 (Ill. App. Ct. 1993). Thus, to serve as a basis for recovery, the defendant's conduct must be such that the "'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim[:] Outrageous!'" Doe v. Calumet City, 641 N.E.2d 498, 507 (Ill. 1994) (quoting Restatement (Second) of Torts sec. 46 cmt. d (1965)) (internal quotation marks omitted). Whether conduct is extreme and outrageous is judged on an objective standard, based on the facts of the particular case. See id.

1.  Extreme and Outrageous Conduct

   With regard to the first prong of this tort, whether the conduct alleged is extreme and outrageous, the Supreme Court

of Illinois in McGrath described a number of non-exclusive factors that can inform this analysis. First, "the degree of power or authority which a defendant has over a plaintiff can impact . . . whether that defendant's conduct is outrageous," and the "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." McGrath, 533 N.E.2d at 809-10. In examining this factor, courts have noted that it is appropriate to consider not only the power and influence wielded by the harassing party, see Lopacich v. Falk, 5 F.3d 210, 212 (7th Cir. 1993); Milton v. Illinois Bell Tel. Co., 427 N.E.2d 829, 832 (Ill. App. Ct. 1981), but also the likelihood that the threatened action could be carried out, see Lopacich, 5 F.3d at 212; Plocar v. Dunkin' Donuts of Am., Inc., 431 N.E.2d 1175, 1180 (Ill. App. Ct. 1981). In doing so, courts have found extreme and outrageous behavior to exist in the employer/employee context where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment./10 Such an abuse of power also has been found where defendants exercised great economic leverage over a plaintiff and attempted to defraud that plaintiff out of millions of dollars, see McGrath, 533 N.E.2d at 812; where disc jockeys used the medium of radio to belittle plaintiffs suffering from a disfiguring disease, see Kolegas, 607 N.E.2d at 212; or where a police officer abused his position of power by berating a sexual assault victim and refusing to save her children from attack for fear of personal liability for property damage, see Doe, 641 N.E.2d at 507-08.

Another factor considered by the courts is whether the defendant reasonably believed that his objective was legitimate; greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff. See McGrath, 533 N.E.2d at 810. For example, courts have recognized that employers will often take actions that

may cause their employees serious upset, but such actions have not been classified as "extreme and outrageous" when they did not go well beyond the parameters of the typical workplace dispute./11 Additionally, in cases involving the actions of creditors who aggressively request payment, see Public Fin. Corp. v. Davis, 360 N.E.2d 765, 768 (Ill. 1976); Sutherland v. Illinois Bell, 627 N.E.2d 145, 153 (Ill. App. Ct. 1993), or legal authorities who assertively carry out their enforcement duties, see Khan v. American Airlines, 639 N.E.2d 210, 215 (Ill. App. Ct. 1994), abrogation on other grounds recognized by Velez v. Avis Rent A Car Sys., Inc., 721 N.E.2d 652 (Ill. App. Ct. 1999); Anderson v. Village of Forest Park, 606 N.E.2d 205, 214 (Ill. App. Ct. 1992), courts often have not found extreme and outrageous behavior to exist, as such actions were undertaken with legitimate objectives in mind.

An additional consideration in determining whether extreme and outrageous behavior exists is whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity; behavior that otherwise might be considered merely rude, abrasive or inconsiderate may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional turmoil. See McGrath, 533 N.E.2d at 811–12 (defendants knew plaintiff was suffering from heart disease); Pavilon v. Kaferly, 561 N.E.2d 1245, 1252 (Ill. App. Ct. 1990) (defendant knew plaintiff was undergoing psychotherapy); Wall v. Pecaro, 561 N.E.2d 1084, 1088 (Ill. App. Ct. 1990) (defendant knew plaintiff was pregnant).

Mr. Honaker claims that Mr. Smith's actions in allegedly setting fire to his house and failing to properly extinguish that blaze suffice to demonstrate extreme and outrageous conduct under Illinois law. As we have previously explained in this opinion, there is insufficient evidence to suggest that Mr. Smith or the Lovington Fire Department were deficient in any way in putting out the fire at Mr. Honaker's house. However, Mr. Honaker's claim that Mr. Smith played a role in setting the fire deserves further analysis. As an initial matter, setting fire to a person's house because one

believes the house's physical appearance is unsightly is similar in character to acts that have been deemed extreme and outrageous under Illinois law. Illinois courts have found actions to be extreme and outrageous in situ-ations such as when a financial institution attempted to defraud a plaintiff suffering from heart disease out of millions of dollars, see McGrath, 533 N.E.2d at 812; when radio disc jockeys denigrated the physical appearance of a plaintiff's relatives who were afflicted with a disfiguring disease, see Kolegas, 607 N.E.2d at 212; when an employer pressured an employee for dates, offered her money in return for sexual favors, and threatened to kill and rape her, see Pavilon, 561 N.E.2d at 1251-52; when a police officer berated a sexual assault victim and refused to save her children for fear of personal liability for property damage, see Doe, 641 N.E.2d at 507-08; and when a defendant conspired to murder his estranged wife, see Vance v. Chandler, 597 N.E.2d 233, 236-37 (Ill. App. Ct. 1992). We believe that, like the circumstances in these cases, intentionally causing a person's house to be set on fire in an effort to force him to leave town also would be deemed to "go beyond all possible bounds of decency . . . and be regarded as intolerable in a civilized community." Kolegas, 607 N.E.2d at 211.

Additionally, the factors listed above, which provide Illinois courts with guidance in determining whether extreme and outrageous behavior exists, also provide some assistance in evaluating Mr. Honaker's claim. Mr. Smith, as Mayor of the Village, obviously had a certain standing in the community. Moreover, if Mr. Smith actually did cause the fire to be set, that action would not be one in which Mr. Smith had a plausible belief that his conduct was legitimate./12 We therefore conclude that having a house burned under the circumstances described in this record is the sort of extreme and outrageous conduct that the Supreme Court of Illinois would consider actionable.

Mr. Honaker also must have demonstrated a sufficient evidentiary basis for a jury to find that Mr. Smith did in fact engage in such conduct. No physical evidence was found to link Mr. Smith to the fire's origin and no witnesses testified that

they knew Mr. Smith to be connected in any way with the blaze. Both Tankersly and an investigator from the Illinois State Police, Rodney Miller, examined the fire's origin and found no evidence linking Mr. Smith to the start of the conflagration. However, Mr. Honaker claims that a few months prior to the fire, Mr. Smith approached him and "told me to get my stuff and get out of town. He'd burn me out." R.70 at 76./13

   Moreover, the fire was set under suspicious circumstances. Indeed, the fire inspector concluded that the conflagration was set intentionally. Mr. Honaker clearly had a longstanding history of acrimonious relations with the Village and with Mr. Smith personally. Mr. Honaker had engaged in contentious litigation with the Village in the past and also had been issued citations by local authorities a number of times due to the poor condition of his property. He testified that, at least once a week, Village personnel would walk by his property and make derogatory comments about its physical appearance. A number of Village residents also complained frequently about the property at City Council meetings, meetings at which Mr. Smith and the other members of the City Council discussed what they could do to address those complaints. Jokes were made by some residents and City Council members at these meetings, while Mr. Smith was in attendance, to the effect that, if a fire were to occur at Mr. Honaker's house, it would not be a bad thing for the Village./14 At one meeting prior to the fire, when Crafton raised a number of complaints about the property's condition, Mr. Smith told Crafton that he would look at the property and do whatever he could to resolve the problem under the law. Lastly, a number of witnesses testified that, due to the problems with the Honaker property, general feelings of animosity existed between Mr. Smith and Mr. Honaker.

   In addition, Mr. Honaker's house was not the first troublesome property for the Village that had burned down. Prior to Mr. Honaker's fire, Lovington resident Tom Brewer saw buildings that he had owned catch fire under what even Mr. Smith agreed were suspicious circumstances. Just a few weeks prior to

that fire, the Village had requested that Brewer tear those buildings down, as there had been complaints about their condition at City Council meetings. The parallels between the fire at the Brewer property and that at Mr. Honaker's house are difficult to ignore.

Ultimately, no direct evidence was presented linking Mr. Smith to the fire at Mr. Honaker's house. Mr. Smith was certainly not the only Village resident who was angered by the condition of the Honaker property./15 The only piece of evidence that concretely suggests that Mr. Smith set the fire was the alleged conversation between the two men, in which Mr. Honaker claims that Mr. Smith asserted that he would burn Mr. Honaker out of town. However, there is also little question that the house burned under questionable circumstances and that many members of the City Council, including Mr. Smith, were upset about the condition of the property and had complained about it for quite a while. Many witnesses testified that there was also longstanding animosity between Mr. Honaker and Mr. Smith. We believe that these facts, viewed in the light most favorable to Mr. Honaker, provide a legally sufficient amount of evidence to suggest that Mr. Smith might have beenresponsible for setting the fire, such that he could be said to have engaged in "extreme and outrageous" conduct under Illinois law.

2. Intent to Cause or the High Probability of Distress

The tort's second element inquires as to whether the actor either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause such distress. Courts have generally found this element to be satisfied either when a defendant's actions, by their very nature, were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress and that, because of this susceptibility, the defendant's actions were likely to cause it to occur./16 In this case, a jury might well conclude that the burning of Mr. Honaker's house would bring with it the high probability of causing severe emotional distress to Mr. Honaker. Having

the mayor of one's town suggest that you leave or be burned out, followed by a fire that all but completely destroys your house, is likely to cause significant emotional trauma./17

3. Severity of the Distress

The third element of the tort focuses on the severity of the emotional distress; it was regarding this element that the district court specifically found that Mr. Honaker had not put forward sufficient facts to sustain his claim.

Illinois courts have explained that:

The emotional distress must be severe. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term "emotional distress," these mental conditions alone are not actionable. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity."

Welsh v. Commonwealth Edison Co., 713 N.E.2d 679, 684 (Ill. App. Ct.) (emphasis in original) (quoting Public Fin. Corp., 360 N.E.2d at 768), appeal denied, 720 N.E.2d 1107 (Ill. 1999). Indeed, over time, Illinois courts have delineated with some precision the type of emotional distress that is sufficiently severe to meet the law's requirements. More specifically, when plaintiffs have complained that a defendant's actions caused them simply to become annoyed, frustrated, stressful, distressed, embarrassed, humiliated or nervous, those plaintiffs have been found not to have stated a claim under Illinois law./18 In contrast, when the distress has manifested itself either through physical symptoms or has necessitated medical treatment, Illinois courts have been more inclined to characterize the emotional distress as severe./19 Yet neither physical injury nor the need for medical treatment is a necessary prerequisite to establishing severe emotional distress. See Bristow v. Drake St. Inc., 41 F.3d 345, 349-50 (7th Cir. 1995); Corgan, 574 N.E.2d at 609; Clark v. Owens-Brockway Glass Container, Inc., 697 N.E.2d 743, 748 (Ill. App. Ct. 1998). In some

instances, when no physical manifestation of the emotional distress existed and where no medical treatment was sought, Illinois courts have still found that a plaintiff could establish severe emotional distress. See, e.g., Amato v. Greenquist, 679 N.E.2d 446, 455 (Ill. App. Ct. 1997) (plaintiff satisfactorily alleged that minister's actions caused him distress, when minister abused counseling relationship with plaintiff's wife by engaging in affair with her, causing "depression, despair, insomnia, anxiety, nervousness and emotional trauma" in plaintiff); Vance, 597 N.E.2d at 237 (plaintiff could survive motion to dismiss when her estranged husband allegedly conspired to have her murdered, which caused her to become "extremely fearful for her life, safety, health and welfare" and to suffer "great emotional distress").

Additionally, some Illinois cases have noted the principle, stated in the Second Restatement of Torts, that "[s]evere distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Wall, 561 N.E.2d at 1088; see also Kolegas, 607 N.E.2d at 213. These cases have acknowledged that, even when significant evidence was not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim. See Kolegas, 607 N.E.2d at 213 (when radio station knew plaintiffs had neurofibromatosis and nevertheless made false and highly offensive comments regarding the effects of the disease upon their personal appearance, severe distress presumed); Wall, 561 N.E.2d at 1088 (when plaintiff alleged that physician harassed her to have surgery removing part of her head's internal structures and tissues and to abort her fetus, all to cover up previous medical malpractice on his part, severe distress presumed). In Bristow v. Drake Street Inc., 41 F.3d 345 (7th Cir. 1994), we extensively discussed when emotional distress is sufficiently severe under Illinois law. In the course of that discussion, we also took note that Illinois courts, following the Restatement, have "tend[ed] to merge the issue of the outrageousness of the defendant's conduct with the issue of the

severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress." Id. (internal citation omitted).

In this case, Mr. Honaker testified that when he saw his house burning on the morning of the fire, he was upset and "got mad and started yelling at everybody." R.70 at 96. Additionally, he points to the testimony of two witnesses to confirm the severity of the emotional distress he suffered. His ex-wife, Virginia Honaker, explained that on the day of the fire, Mr. Honaker was "pissed" and that he was "cussing, raising all kinds of cain, hollering at the neighbors, everybody else, screaming to the top of his lungs because his house was burned." Id. at 380. However, she also qualified some of her answers regarding the seriousness of Mr. Honaker's mental state. For example, Virginia Honaker explained that at one point, Mr. Honaker was "bawling," though when asked if that was unusual for him, she replied "Depends." Id. When asked if it took Mr. Honaker a while to get over his house being burned down, she answered "[a]ccording to him, yes." Id. at 381. Additionally, James Webb, a neighbor of Mr. Honaker's, testified that on the day of the fire, Mr. Honaker was "visibly upset" and "very distraught, nervous." Id. at 308. Webb also observed that he had only seen Mr. Honaker in that emotional state once before, upon his divorce from Virginia Honaker. Aside from the testimony of these two witnesses, Mr. Honaker points to no other evidence to establish severe emotional distress.

The district court took the view that the evidence was, as a matter of law, insufficient to permit a jury to determine that the emotional distress was sufficiently severe to be actionable. In reaching this determination, the court placed great, and perhaps controlling, weight on the fact that this testimony focused on the manifestations of Mr. Honaker's distress on the day of the fire. Although duration is certainly a factor to be weighed in determining the severity of the plaintiff's distress, see Welsh, 713 N.E.2d at 684, it is not the only factor that ought to be considered. Here, the district court apparently gave no consideration as to whether the

severity of the alleged conduct--being told by the mayor to get out of town or be burned out followed by the burning of the house--permitted the reasonable inference that Mr. Honaker's distress was not only severe but of significant duration. We believe that the magnitude of that conduct, in conjunction with the evidence of emotional distress that Mr. Honaker did put forward, could allow a jury to find that he suffered severe emotional distress in this case.

Accordingly, although we express no view on the ultimate outcome of the case, we cannot sustain the dismissal of this count alleging a cause of action for the intentional infliction of emotional distress under the law of Illinois.

Conclusion

The district court properly determined that insufficient evidence existed for a jury to find that, under color of state law, Mr. Smith played a role in setting fire to Mr. Honaker's house. The court was also correct in its determination that Mr. Honaker did not put forward enough evidence to demonstrate that Mr. Smith, in his role as Lovington's Fire Chief, used less than his best efforts to extinguish that fire. Accordingly, we affirm the district court's grant of judgment as a matter of law in favor of Mr. Smith on the Section 1983 claims.

With respect to the state law-based claim for the intentional infliction of emotional distress, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

AFFIRMED in part,
REVERSED and REMANDED in part.

FOOTNOTES

/1 Pallets are portable wooden platforms used for storing or moving cargo or freight. Mr. Honaker either bought lumber to build his pallets or, more commonly, hauled away previously made pallets from local businesses and rebuilt them. This rebuilding process would entail tearing the pallet apart by hand, cutting it down to size, rebuilding it and sending it out for sale.

/2 After the fire, the frame of the house continued to stand, but the house was not habitable. Mr.

Honaker made repeated efforts to rebuild the house, all of which failed due to the weakness of the structure's frame. As a result, Mr. Honaker eventually sold the property and left Lovington.

/3 Counts II and III of the complaint maintained that Mr. Smith conspired with Doug Thomas and other unnamed individuals to set fire to Mr. Honaker's house and to fail to extinguish properly that fire, in violation of 42 U.S.C. sec.sec. 1983 and 1985, respectively. The district court granted Mr. Smith's motion for judgment as a matter of law at the close of all of the evidence on these claims, based upon its finding that the evidence presented was insufficient to demonstrate a conspiracy. Mr. Smith does not challenge these rulings on appeal.

/4 Rule 50 states, in pertinent part:

(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment . . . . In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law[.]

Fed. R. Civ. P. 50(b).

/5 This claim is much different from others in which, for example, a mayor has been found to be acting under color of state law. See, e.g., Pleva v. Norquist, 195 F.3d 905, 911 (7th Cir. 1999) (appellees did not contest that mayor was acting under color of state law when mayor made decision not to reappoint member of Board of Zoning Appeals to that position); Esmail v. Macrane, 53 F.3d 176, 177-80 (7th Cir. 1995) (plaintiff's Section 1983 suit against mayor was cognizable where mayor was also city's liquor commissioner, and plaintiff accused mayor of improperly denying plaintiff's request for liquor license in violation of plaintiff's equal protection rights).

/6 Mr. Honaker's conspiracy claim seems to be based

on the following facts: (1) Thomas gave conflict-
ing accounts of where he was on the night of the
fire and why he did not respond to the scene, (2)
rumors circulating around Lovington after the
fire hinted that Thomas might have been involved
in it in some way and (3) Mr. Smith and Thomas
knew each other from their work on the City
Council and at the Fire Department. The district
court determined that Mr. Honaker had produced no
evidence of a conspiracy to violate his civil
rights that included Mr. Smith, Thomas or anyone
else. See R.70 at 418. As a result, it directed
a verdict for Mr. Smith on the conspiracy claims
in the complaint. Mr. Honaker did not appeal the
court's ruling in that respect.

/7 See R.70 at 143 (testimony of Mr. Smith that,
after receiving the call regarding the fire just
before 2:00 a.m., he went directly to the scene,
where firefighters were already present); id. at
209-11 (testimony of firefighter Steven Fleming
that, after receiving the fire call, he ran from
his home to the fire station next door and drove
for one minute from the station to Mr. Honaker's
house in a fire truck); id. at 294 (testimony of
firefighter Harold White that, after receiving
the fire call, he arrived at the scene "within
three to five minutes").

The district court noted that a neighbor of Mr.
Honaker's, Gary Newberry, testified that the fire
had been burning for a lengthy period before the
firefighters responded to the scene. However, the
court found that, because Newberry, a schizo-
phrenic who was on disability, testified based
upon "at best . . . a very unclear recollection,"
and because all other evidence demonstrated that
the firefighters responded immediately to the
call reporting the fire, his testimony "would not
support a conclusion that the fire was burning
for a lengthy period of time before the fire-
fighters arrived." R.61 at 9 n.3. In fact, New-
berry's testimony on this point was very unclear.
When asked how much time had elapsed between when
he saw the house burning and when firefighters
arrived, Newberry replied "And I don't--I'll just
say about 15, 30 minutes. I don't know. It's
probably--I don't know." R.70 at 261. Newberry
was then reminded by Mr. Honaker's lawyer that at
a deposition a year earlier he had agreed with a
statement suggesting that fire trucks did not
arrive at the fire until an hour after it began.
Newberry was then asked if "maybe your memory was
better a year ago than it is now?" Id. He re-
plied, "No." Id. Moreover, as stated earlier, all
of the evidence on the point suggested that,
immediately upon being notified of the fire, the
Lovington Fire Department responded to the scene
within minutes.

/8 Additionally, Illinois State Police investigator Rodney Miller confirmed that, immediately after the fire, Mr. Smith explained that he did not allow firefighters to enter the house due to its poor structural makeup. Mr. Smith himself also testified that during the fire "[y]ou could see the floor joists from above which was sagging, and one was completely broken in two." R.70 at 406.

/9 Mr. Honaker also continually emphasized, in his briefs and at oral argument, that Mr. Smith told the firefighters that Mr. Honaker's house "isn't worth getting hurt for."  Appellant's Reply Br. at 4. The relevant portion of trial testimony on this point reads as follows:

Q [Mr. Honaker's attorney]  But you made the decision that that house wasn't worth getting hurt for?

A [Mr. Smith]Me and the assistance.

Q  So, it was more than you. You made that decision in concert with someone else?

A  We knew the wall, the beams was leaning, and I didn't think it was safe to go in myself either.

Q You made that decision in concert with someone else?

A  I can say I probably made that decision on my own. I told them about it. I didn't want anybody to go in, and they [agreed]--"Yes, we'd seen it."

R.70 at 167. This testimony makes clear that Mr. Smith himself did not use the phrase "that house wasn't worth getting hurt for"--those words were provided by Mr. Honaker's attorney. Additionally, the context of Mr. Smith's agreement with that statement demonstrates that the "decision" not to enter was made not because Mr. Smith believed that Mr. Honaker's house in particular was not worth saving, but because the house's deteriorating physical structure would have made any possible entry a dangerous proposition, regardless of who owned the structure. As a result, we cannot agree with Mr. Honaker that this statement is a significant piece of evidence demonstrating that Mr. Smith's desire was to see Mr. Honaker's house burn to the ground.

/10 See, e.g., Patterson v. Xerox Corp., 901 F. Supp. 274, 279 (N.D. Ill. 1995) (persistent harassment of pregnant employee by supervisor, including the berating of the employee for absence from work while employee was hospitalized for premature labor); Pavilon v. Kaferly, 561 N.E.2d 1245, 1251

(Ill. App. Ct. 1990) (employer pressured employee for dates, offered her money in return for sexual favors, and threatened to kill and rape her); Milton v. Illinois Bell Tel. Co., 427 N.E.2d 829, 832 (Ill. App. Ct. 1981) (employer allegedly engaged in an extensive course of disciplinary and harassing conduct to coerce the plaintiff to falsify illegally work reports).

/11 See, e.g., Van Stan v. Fancy Colours & Co., 125 F.3d 563, 568-69 (7th Cir. 1997); Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir. 1993); Brackett v. Galesburg Clinic Ass'n, 689 N.E.2d 406, 409 (Ill. App. Ct. 1997); Lundy v. Calumet City, 567 N.E.2d 1101, 1103 (Ill. App. Ct. 1991); Harris v. First Fed. Sav. & Loan Ass'n of Chicago, 473 N.E.2d 457, 458-60 (Ill. App. Ct. 1984).

/12 As to the third indicator that the McGrath court set forth to assist in determining extreme and outrageous conduct, whether a plaintiff was particularly susceptible to distress, Mr. Honaker does not cite any physical or mental condition that might suggest such susceptibility.

/13 Again, Mr. Smith has emphatically denied that this conversation ever took place, that he ever threatened Mr. Honaker or that he had anything to do with the start of the fire.

/14 Mr. Smith has denied taking part in these jokes.

/15 Additionally, there was some evidence that Mr. Honaker had threatened to resort to the use of fire to resolve situations in the past. More specifically, Virginia Honaker, Mr. Honaker's ex-wife, testified that Mr. Honaker had lived previously in a house in Sullivan that also burned to the ground. Additionally, she claimed that Mr. Honaker had blown up the trailer that his previous ex-wife had lived in, in order to "get her out of it." R.70 at 366. She also maintained that at numerous times during her marriage to Mr. Honaker, he threatened to burn her out of their home. For his part, Mr. Honaker testified that he did not blow up his ex-wife's trailer and that the trailer still sat on land in nearby Shelbyville, Illinois. Mr. Honaker also denied that he threatened to destroy the home he shared with Virginia Honaker.

/16 See, e.g., Doe v. Calumet City, 641 N.E.2d 498, 508 (Ill. 1994) (when plaintiff had been victim of past assault and had summoned officer to protect her and her children from present attack, officer's conduct in making derogatory comments toward plaintiff and failing to protect children demonstrated disregard of the high probability that his actions would cause severe distress);

Vance v. Chandler, 597 N.E.2d 233, 237 (Ill. App. Ct. 1992) (defendant's numerous dealings with third parties regarding a conspiracy to murder plaintiff showed reckless disregard that the plans would become known to plaintiff and would cause severe distress); Pavilon, 561 N.E.2d at 1252 (defendant's close relationship with plaintiff, the knowledge that defendant derived from that relationship that plaintiff was undergoing psychotherapy and the fact that defendant was a trained psychotherapist demonstrated that he intended his sexually harassing conduct to inflict severe distress).

/17 Here, we view, as we must, the evidence in the light most favorable to the non-moving party.

/18 See, e.g., Karkomi v. American Airlines, Inc., 717 F. Supp. 1340, 1345 (N.D. Ill. 1989) (airline passengers, whose tickets were confiscated by airline, sustained at worst brief "public humiliation and embarrassment" and perhaps fleeting fear of being unable to return home); Johnson v. K Mart Corp., 723 N.E.2d 1192, 1198 (Ill. App. Ct.) (plaintiffs merely noted "feelings of stress or distrust" when employer placed private detectives in workplace to uncover personal information), appeal allowed, 729 N.E.2d 496 (Ill. 2000); Welsh v. Commonwealth Edison Co., 713 N.E.2d 679, 684 (Ill. App. Ct.) (employees of nuclear power station who suffered "anxiety, humiliation and extreme and severe emotional distress" could not demonstrate sufficient severity due to demotions that allegedly arose from their voicing of safety concerns), appeal denied, 720 N.E.2d 1107 (Ill. 1999); Adams v. Sussman & Hertzberg, Ltd., 684 N.E.2d 935, 942 (Ill. App. Ct. 1997) (fear and embarrassment for reputation regarding arrest for traffic violations, reducing plaintiff to tears, insufficient to show emotional distress); Knysak v. Shelter Life Ins. Co., 652 N.E.2d 832 (Ill. App. Ct. 1995) (depression and distress suffered as a result of insurer's failure to pay insured spouse's medical bills not sufficient); Khan v. American Airlines, 639 N.E.2d 210, 215 (Ill. App. Ct. 1994) (recurring nightmares, problems with sleeping and fear of re-arrest were not severe distress for passenger wrongly charged with theft of ticket by airline); Sutherland v. Illinois Bell, 627 N.E.2d 145, 154 (Ill. App. Ct. 1993) (where customer was "frustrated, annoyed and disgusted" with her phone service and was pressured by phone company to pay bills, insufficient distress shown); Lundy v. Calumet City, 567 N.E.2d 1101, 1104 (Ill. App. Ct. 1991) (embarrassment or distress suffered by plaintiff police officers when they were stripped of badges and guns and relieved of duty until they could undergo a psychological reevaluation did not support claim); Miller v. Equitable Life

Assurance Soc'y, 537 N.E.2d 887, 889-90 (Ill. App. Ct. 1989) (plaintiff-employee's "stress" was not severe enough to establish cause of action where she alleged that her coworkers were inconsiderate, uncooperative, unprofessional and unfair).

/19 See, e.g., Doe, 641 N.E.2d at 508 (severe distress established where plaintiff required psychological care after the incident); McGrath v. Fahey, 533 N.E.2d 806, 808 (Ill. 1988) (where plaintiff alleged that defendant engaged in pattern of extortion to defraud plaintiff out of millions of dollars, and where plaintiff experienced anxiety, became physically ill when discussing the situation and later suffered a heart attack, severe distress shown); Pavilon, 561 N.E.2d at 1252 (severe distress established where employer's threatening conduct forced employee to continue her psychotherapy treatment for long duration and where therapist's testimony described employee as being "scared, angry, and unable to cope with her child, her work and her relationship with men generally as a result of these problems").