In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-4435

DEBRA L. LEWIS,

*Plaintiff-Appellant*,

*v.*

SCHOOL DISTRICT #70, a corporation,
JOHN BLOMENKAMP, TAMMY CARPENTER, et al.,

*Defendants-Appellee*s.

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 C 776—**William D. Stiehl,** *Judge*.

———————

ARGUED OCTOBER 29, 2007—DECIDED APRIL 17, 2008

———————

Before BAUER, RIPPLE and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Debra Lewis brought this action against: her employer, Freeburg Community School District No. 70; the school superintendent, Rob Hawkins; the school district's attorney, Shane Jones; the school board; and members of the school board in their individual

capacities.[1] She alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.; she also brought supplemental state claims for breach of contract, defamation and intentional infliction of emotional distress. The district court granted summary judgment on all counts in favor of the defendants. Ms. Lewis timely appealed. For the reasons set forth in this opinion, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

# I

## BACKGROUND

Because this case is here on a grant of summary judgment for the defendants, we must review the facts in the light most favorable to the plaintiff. *Squibb v. Mem. Med. Ctr.*, 497 F.3d 775, 780 (7th Cir. 2007).

Freeburg Community School District No. 70 ("the District") is a public school system located in St. Clair County, Illinois. The District is governed by a seven-member Board of Education ("school board"). In March 2005, its members included defendants John Blomenkamp, Tammy Carpenter, Steve Lindauer, Herschel Parrish, Dean Salvatore, Scott Weber and Richard Trolard.[2] Dr. Rob

---

[1] Ms. Lewis initially filed her complaint in state court, but the defendants removed the case to federal court. The district court had jurisdiction over her claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). We have jurisdiction to review the district court's decision under 28 U.S.C. § 1291.

[2] Laurie Watkins became a board member in April of 2005. She was not a board member at the time of the events relevant to
(continued...)

Hawkins is the superintendent of the school district, and he is responsible for overseeing the functions and performance of all the District's employees. Dr. Hawkins makes recommendations to the school board regarding the selection and dismissal of employees; however, all final employment decisions are within the province of the school board.

Ms. Lewis began working for the District as a bookkeeper and treasurer in September 1997. She was responsible for: maintaining all financial accounts and records; preparing payroll, tax returns and other required state financial reports; paying bills monthly; preparing monthly cafeteria reports and financial reports; and otherwise assisting the superintendent. All parties agree that Ms. Lewis performed her job admirably until 2004.

The year 2004, however, was a truly terrible year for Ms. Lewis. Both of her parents became terminally ill, and Ms. Lewis attempted to care for them at home. Her father died at home on May 23, 2004, and in a tragic sequence of events, five other family members or close friends passed away that year. On May 31, 2004, her mother came home from the hospital and needed constant care. Ms. Lewis thereafter often missed work to care for her mother at home. Dr. Hawkins, her immediate supervisor, was aware that Ms. Lewis was taking time off from work in order to care for her ailing parents, and he gave her

---

[2] (...continued)
this suit, and the claims against her therefore properly were dismissed by the district court.

permission to do so. In the 2004 fiscal year,[3] Ms. Lewis was absent a total of 72.5 out of a possible 242 workdays.

During this time, with the encouragement of Dr. Hawkins, Ms. Lewis took much of her bookkeeping work home with her and worked whenever she could, including in the evenings or on weekends. She was able to get much of the bookkeeping work done that way. According to Dr. Hawkins, however, her "flex-time" schedule began to be a problem for the school district because other employees were forced to alter their schedules to cover for Ms. Lewis, and she was not available during regular work hours to answer questions from employees or vendors.

On June 28, 2004, the school board met in a closed session to discuss employee salaries. Although the meeting was closed to the public, it was tape recorded in compliance with the requirements of the Illinois Open Meetings Act, 5 ILCS 120/2.06(a). In the meeting, Dr. Hawkins proposed that Ms. Lewis be given a small raise, but he also informed the board that she had been absent 47.5 days so far that year. He explained some of the hardships caused to the District by her absences: Ms. Lewis had failed to produce a cafeteria report for a number of months, and Dr. Hawkins had been forced to make a list of priorities and pay some of the District's bills himself. He also remarked that the office did not function as smoothly without Ms. Lewis there to help answer phones and dispose of mail, and he lamented that she was unavailable for vendor calls. At that time, a number of board members

---

[3] The District's fiscal year begins on July 1 and concludes the following June 30.

expressed the view that they ought to start looking for a new bookkeeper, but Dr. Hawkins dissuaded them.

That same day, however, Dr. Hawkins sent Ms. Lewis a letter advising her that she should resume a regular 8:00 a.m. to 4:00 p.m. work schedule by the start of the next school year. The letter identified the aspects of her job that required her attendance during normal business hours: assisting with covering the office during lunch breaks, assisting with answering the phone, being available for teachers, staff, and himself for information, and being available for vendors when they call with questions.

Nevertheless, in September 2004, Ms. Lewis missed 6 of 21 days of work; in October she missed 7 of 20. At the school board's October meeting, Dr. Hawkins again made mention of the inconveniences caused by Ms. Lewis' large number of absences; he also described a number of "performance" problems that he claimed were unrelated to her absences. Specifically, he noted that: the District's tax payments to the IRS had been late, resulting in a penalty (although Ms. Lewis ultimately had been able to get it waived); the District had been denied credit from Verizon due to a blemish on its credit check; the 2004 completion report had not been filed; a number of cafeteria reports had not been completed; other bills were not being paid timely; and Ms. Lewis had not compiled her own attendance report. He also mentioned that her office was a mess. At least one board member expressed the view that she should be fired for absenteeism and poor performance. Dr. Hawkins, however, informed the board that the District faced potential legal liability under the FMLA; accordingly, he suggested that Ms. Lewis be approached and offered official FMLA leave instead. The board gave its approval, and on November 9, 2004, Dr. Hawkins sent

a letter to Ms. Lewis, informing her that her paid sick leave and vacation time had run out but that she was entitled to take up to 12 weeks of unpaid leave under the FMLA.

Ms. Lewis completed the necessary paperwork and, at the direction of Dr. Hawkins, subsequently began taking intermittent FMLA leave. Ms. Lewis and Dr. Hawkins established a procedure by which she would call the office whenever she needed to take leave and inform Dr. Hawkins that she was going to be absent that day. She simply was required to specify that her absence was for FMLA reasons, and her absence would then be "excused," though unpaid.

During the time that she was taking intermittent FMLA leave, however, Ms. Lewis still was asked to perform all of the functions of a bookkeeper. She was able, to some extent, to determine her own schedule, but she continued to do much of the District's bookkeeping work at her home and on weekends in order to ensure that necessary tasks were completed. She never was credited for her time spent working at home, however, and she was not paid for the days on which she took FMLA leave. The school board was well aware of this practice; in fact, Dr. Hawkins even commented to the board that Ms. Lewis actually was "helping the budget because she's, uh, already being docked because she's exhausted all of her sick days, she's been gone for all of her vacation days, her bereavement day and her personal day and she's 22 in the hole." R.76, Ex. 5 at 3. Despite the alleged difficulties caused by her absences, however, the District never sought any part-time help for the bookkeeper position during the period in which Ms. Lewis was taking intermittent leave.

Throughout 2004, the school board continued to discuss Ms. Lewis and the problems caused by her absences. On November 22, 2004, in another closed-session meeting, a number of board members expressed the opinion that they would like to fire Ms. Lewis; however, they were concerned about their potential legal liability under the FMLA. Dr. Hawkins confirmed their fears, stating that "we don't have anything, it's all too soft to do anything about her in terms of performance . . . . [I]f she didn't have the FMLA issue it would be easier for me to do something . . . ." *Id.* at 22. The board members responded by discussing the FMLA with disdain, noting that it was "just ludicrous," *id.* at 25, and "it's such a fiasco that you can't just say thank you for your services, good-bye," because of "FMLA and Bill Clinton." *Id.* at 29. Dr. Hawkins was encouraged to continue documenting any performance-related problems in order to build a case against Ms. Lewis that was unrelated to her absences. *Id.* at 25.

On March 10, 2005, Ms. Lewis received her first and only performance review from Dr. Hawkins. The review form contained three potential rankings: very good, satisfactory and needs improvement. Ms. Lewis received two rankings of "very good," seven rankings of "satisfactory" and four rankings of "needs improvement." R.67, Ex. JJ. The areas that needed improvement were: "works in a manner that promotes safety, cleanliness and efficiency"; "demonstrates pride in work by performing tasks neatly and accurately"; "shows punctuality and has excellent attendance"; and "demonstrates professionalism through appropriate dress, language, and interactions." *Id.* In the comments section adjacent to the "pride in work" category, Dr. Hawkins noted: "This was not a problem previously.

It has become an issue the past 6 mo[nths] with the reduced hour week. While I believe Mrs. Lewis still takes pride in her work, time constraints have caused problems." *Id*. Additionally, at the bottom of the form, he wrote:

> Deb, Most of the items that are "satisfactory" or "needs improvement" are a direct result of your reduced hour schedule. As I have mentioned many times when we discuss this, I understand your commitment to taking care of your parents. I also understand you are doing what you can to prioritize so that crucial deadlines are not missed. Unfortunately, as I told you, you cannot continue as you are and be effective in all arenas. I understand your personal dilemma. I have tried to balance that with the needs of the district. Rob.

*Id*.

On March 21, 2005, the school board again met in a closed session and discussed Ms. Lewis. Although state law requires that closed sessions of school board meetings be tape recorded, the first fifty-six minutes of the eighty-one-minute session—coincidentally, the portion of the meeting in which Ms. Lewis was discussed—are missing from the meeting's recording. Two conflicting explanations for the missing segment of tape exist in the record: one note, signed by Dr. Hawkins, states that the machine had malfunctioned, and another (unsigned) note states that the operator had believed that the machine was running from the beginning of the session, but later had realized that it was not and began recording. The written minutes of the meeting reflect only that Dr. Hawkins recommended that Ms. Lewis be replaced as bookkeeper. The minutes do not state whether a vote of the board was taken, although each board member has signed a sworn

statement that the board voted at this meeting to replace Ms. Lewis as bookkeeper.

The District ultimately decided to offer Ms. Lewis two options: either (1) resignation, with paid insurance for the rest of the school year, or (2) reassignment to a teacher's assistant position, paid her current salary and benefits for the few months remaining in that fiscal year, but paid at the much lower teacher's assistant salary thereafter. Dr. Hawkins testified in his deposition that the reassignment, if accepted, was not intended to be temporary—it was decided at the March 21 meeting that her demotion would be permanent.

On March 23, 2005, Dr. Hawkins sent a letter to Ms. Lewis on behalf of the District, informing her of the school board's decision to remove her from her position as bookkeeper. The letter offered only one reason for her replacement: "It was determined that you miss too much work to meet the essential functions of your present assignment." R.67, Ex. MM. The letter then explained her choice between resignation or permanent reassignment to a lower position. Dr. Hawkins met with Ms. Lewis the next day to explain further her options and to help her clean out her office. At that time, according to Ms. Lewis, Dr. Hawkins provided his own explanation for the District's actions: He told her that "the board didn't have any idea how much time [she] was missing and they voted to fire [her]." R.67, Ex. C at 142; *see also id.* at 221-22.

Ms. Lewis' husband, an attorney, thereafter wrote an e-mail to Dr. Hawkins, suggesting that the District's actions were in violation of Ms. Lewis' rights under the FMLA. Dr. Hawkins referred the e-mail to the District's counsel, defendant Shane Jones. Mr. Jones responded in a letter to Mr. Lewis, stating that "the district has determined

that Ms. Lewis's performance in the bookkeeper job assignment is not satisfactory," and thus its decision not to reappoint her to her position as bookkeeper for the following year was unrelated to her FMLA leave. R.26, Ex. B.

Ms. Lewis requested reinstatement to her position as bookkeeper in August 2005. Dr. Hawkins and Mr. Jones authored a letter in which they denied her request for reinstatement, citing performance problems that had been discovered after she had been reassigned. These alleged performance problems included newly discovered late payments, overpayments, and checks that had been neither deposited nor voided.

After her request for reinstatement was denied, Ms. Lewis filed suit against the District, the individual members of the school board, Dr. Hawkins, and attorney Shane Jones. Her complaint alleged violations of the FMLA, breach of contract, defamation and intentional infliction of emotional distress. In response, the defendants suggested that Ms. Lewis had been replaced, not because of her absenteeism, but because of performance-related issues.

On June 30, 2006, the district court dismissed the intentional infliction of emotional distress claim against Mr. Jones. On September 6, 2006, the court entered summary judgment in his favor on the defamation claim as well. Ms. Lewis filed a motion to reconsider, which was denied. On November 28, 2006, the district court entered summary judgment on all remaining counts in favor of all remaining defendants. It concluded that the record was replete with evidence of Ms. Lewis' poor performance as bookkeeper and that Ms. Lewis had not presented evidence of retaliation, under either the direct or indirect method of proof, sufficient to establish an issue of triable fact.

Ms. Lewis timely appealed the judgment of the district court.

## II

## DISCUSSION

### A.

We first address a procedural issue raised by Ms. Lewis. She initially filed suit in state court on September 26, 2005, and served all but one of the defendants[4] with process on the same date. The defendants filed a notice of removal on October 25, 2005. Under Federal Rule of Civil Procedure 81(c),[5] a defendant has five days from the filing of the petition for removal in which to file an answer in the district court. Accounting for an intervening weekend, November 1 was therefore the last day for the defendants to file an answer, absent an extension of time. The defendants, however, filed their answer on November 3, 2005. Ms. Lewis moved to strike their answer as untimely, but her motion was denied. She now submits that the district court erred by considering the defendants' answer.

---

[4] Defendant Richard Trolard was not served until October 14, 2005. Therefore, his answer was filed timely, within 20 days of his service of process.

[5] At the time of the events in question, Federal Rule of Civil Procedure 81(c) provided: "In a removal action in which the defendant has not answered, the defendant shall answer . . . within 20 days after the receipt through service or otherwise of a copy of the initial pleading . . . or within 5 days after the filing of the petition for removal, whichever period is longest."

The defendants contend that their answer was not untimely because Federal Rule of Civil Procedure 6(e), read in conjunction with the local electronic filing rules, entitled them to an additional three days to file. Rule 6(e) allows a party additional time to file an answer whenever that party is served by a method other than personal service. At the time that the defendants filed their answer, Rule 6(e) stated:

> Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party under Rule 5(b)(2)(B), or (C), or (D), 3 days shall be added to the prescribed period.

Similarly, the local filing rules provide: "Pursuant to Federal Rule of Civil Procedure 6(e) . . . whenever something is served electronically, three days are added to the prescribed response period." S.D. Ill. Local Electronic Filing Rule 3 (2007). The defendants here filed and served their notice of removal electronically, an act that they contend entitled them to an additional three days to file their answer under Rule 6(e) and Local Rule 3.

The magistrate judge determined that the defendants were entitled to an additional three days (beyond the five days provided for in Rule 81) in which to file an answer. Ms. Lewis objected. Relying on the plain wording of the Rule, she contends that, because the defendants *themselves* had filed the Notice of Removal, their right to file an answer in federal court was not triggered by any electronic service *upon* them. Therefore, Rule 6(e) did not apply. The district court, however, agreed with the magistrate judge. It concluded:

> The plaintiff asserts that only the plaintiff gets an additional three days to respond, not the defendants because they were the party serving the answer. However, the plaintiff appears to overlook the fact that the defendants were also "served" with the complaint, thereby triggering their right to file an answer, and under the Federal Rules giving them an additional three days in which to file.

R.23 at 1-2.

We cannot agree with the district court's interpretation of the Rules. The defendants indeed were served with the complaint in state court; however, that service cannot be seen as the "triggering" event here. If it were, then the defendants' filing certainly was untimely because Rule 81(c) requires an answer to be filed within 20 days of service. Instead, the defendants' own electronic filing of the notice of removal was the event that triggered their right to file an answer in federal court within five days of removal. Fed. R. Civ. P. 81(c). Additionally, service of the complaint here was achieved through personal service; therefore, if the district court was correct in considering that service to be the basis for the defendants' right to file an answer, Rule 6(e) certainly would not have applied. In this case, the only event that potentially could have triggered the application of Rule 6(e) was the defendants' own electronic filing of the notice of removal.

Permitting a party extra time to file an answer because of his own electronic filing finds no support in the plain wording of the rule. Rule 6(e) grants a party an extension of time to respond only "after the service of a notice or other paper *upon* the party" by a method other than personal service. Fed. R. Civ. P. 6(e) (emphasis added). This extension does not appear to apply to actions taken by a

party after the service of a notice or other paper *by* that party. In our view, a facial reading of the Rules makes clear that the defendants here were not entitled to an additional three days under Rule 6(e), and therefore their answer was filed untimely.

Nevertheless, a district court has the discretion to permit the defendants to file their answer late "when the failure to act was the result of excusable neglect." Fed. R. Civ. P. 6(b). A finding of excusable neglect "is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer," *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd.*, 507 U.S. 380, 391 (1993), but extends to some cases in which the delay is "caused by inadvertence, mistake, or carelessness." *Id.* at 388. We have cautioned, however, that "a simple case of miscalculation" of a deadline generally is "not a sufficient reason to extend time." *Marquez v. Mineta*, 424 F.3d 539, 541 (7th Cir. 2005) (quotation marks omitted); *but see Crue v. Aiken*, 370 F.3d 668, 681 (7th Cir. 2004) (upholding a district court's grant of an extension based on "excusable neglect" when an attorney simply miscalculated a thirty-day filing period by one day). Because the district court here determined that the defendants had timely filed their answer, however, it did not reach explicitly the question of whether the defendants' failure to timely file was the result of excusable neglect.

Ms. Lewis relies on language in our decision in *Prizevoits v. Indiana Bell Telephone Co.*, 76 F.3d 132, 133 (7th Cir. 1996), for the proposition that "the excusable neglect standard can never be met by a showing of inability or refusal to read and comprehend the plain language of the federal rules." We believe, however, that this proposition cannot control the situation now before us. In *Prizevoits*, we

distinguished between an inexplicable failure to read the rules and "plausible misinterpretations of ambiguous rules." *Id*. at 134. In *Prizevoits*, the rule was "crystal clear" and the attorney's error "egregious" and "inexplicable." *Id*. Here, by contrast, we have a plausible misinterpretation of a procedural rule—a misinterpretation based on a reading so plausible that both the magistrate judge and the district judge made the same misinterpretation. *Cf. Lorenzen v. Employees Ret. Plan of the Sperry & Hutchinson Co., Inc.*, 896 F.2d 228, 232 (7th Cir. 1996) (holding that delay based on a good faith and "plausible misconstruction" of the law may warrant a finding of excusable neglect).

The Supreme Court has concluded that the determination of "excusable neglect" is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395. The factors to consider include the danger of prejudice, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant had acted in good faith. *Id*. Here, there is no reason to believe that Ms. Lewis was at all prejudiced by the defendants' answer being filed two days late. The length of the delay and the potential impact on judicial proceedings was minimal, and there is no reason to believe that the defendants acted in bad faith. Because the tardy filing was a result of excusable neglect, we conclude that the district court did not abuse its discretion when it denied Ms. Lewis' motion to strike the defendants' answer.

**B.**

We review de novo a district court's grant of summary judgment. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712,

719 (7th Cir. 2005). Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When reviewing a grant of summary judgment, we view all facts in the light most favorable to the nonmoving party, and we draw all reasonable inferences in her favor. *Id*.

The FMLA establishes two categories of protections for employees. First, the Act provides eligible employees the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period because of a serious health condition, including the serious health condition of a family member. *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999). After the period of qualified leave expires and the employee returns to work, she is entitled to be reinstated to her former position or to an equivalent position with the same benefits and terms of employment. *Id.*; 29 U.S.C. § 2614(a). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the Act. 29 U.S.C. § 2615(a)(1).[6]

---

[6] Ms. Lewis alluded in her appellate brief, as well as in her motion for summary judgment, that the school district failed to notify her adequately of her FMLA rights and thereby impermissibly interfered with their exercise. *See* 29 C.F.R. § 825.301(c), (f). By failing to raise this issue in her complaint, however, she has forfeited it. *Stevenson v. Hyre Elec. Co.*, 505

(continued...)

In addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event that they are retaliated against because of their choice to exercise their rights under the Act. *King*, 166 F.3d at 891 (citing 29 U.S.C. § 2615(a)(1) & (2)). Specifically, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave." *Id.* (citing 29 C.F.R. § 825.220(c)). On appeal, Ms. Lewis does not allege that the defendants interfered with her substantive rights under the FMLA; she contends only that she was retaliated against for taking FMLA-protected leave.

A plaintiff can avert summary judgment on an FMLA retaliation claim either by proffering direct or circumstantial evidence of her employer's discriminatory motivation, or by establishing that, after taking FMLA leave, she "was treated less favorably than other similarly situated employees who did not take FMLA leave, even though [s]he was performing [her] job in a satisfactory manner." *Burnett v. LFW, Inc.*, 472 F.3d 471, 481-82 (7th Cir. 2006). The first of these methods of proof—proffering evidence of a retaliatory motive—is referred to as the "direct method." The second method of proof—comparing her treatment to that of a similarly situated employee—is called the "indirect method."

---

[6] (...continued)
F.3d 720, 730 (7th Cir. 2007) ("Stevenson failed to give [the defendant] notice in her complaint of her contention that it failed properly to inform her of her FMLA rights. The district court thus acted within its discretion when it refused to allow her to raise that argument for the first time in her summary judgment motion.").

Ms. Lewis has proceeded under the direct method of proof. A plaintiff proceeding according to this direct method of proof can survive summary judgment by "creating a triable issue of whether the adverse employment action of which she complains had a discriminatory motivation." *Rudin*, 420 F.3d at 721 (internal citations, alterations and quotation marks omitted). Ms. Lewis need not prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by "showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Id.* (quoting *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004)).

Ms. Lewis may use two types of evidence to prove that her employer acted with a discriminatory motivation: "direct evidence" or "circumstantial evidence." *Rudin*, 420 F.3d at 720-21. Direct evidence is evidence "which (if believed by the trier of fact) will prove the fact in question without reliance upon inference or presumption." *Id*. at 720 (quotations omitted). Direct evidence generally involves an admission or a statement by the decision maker regarding his discriminatory intent. Circumstantial evidence "allows the trier of fact to *infer* intentional discrimination by the decisionmaker." *Id*. Direct evidence is not required under the direct method of proof; circumstantial evidence that suggests discrimination, "albeit through a longer chain of inferences," is sufficient. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007). In this case, however, Ms. Lewis has presented both direct and circumstantial evidence of a discriminatory motive sufficient

to avert summary judgment under the direct method of proof.

The most prominent direct evidence proffered by Ms. Lewis is Dr. Hawkins' letter informing her of the District's decision to replace her as bookkeeper. The letter offered only one justification for the District's action: "It was determined that you miss too much work to meet the essential functions of your present assignment." R.67, Ex. MM. Furthermore, according to Ms. Lewis' sworn affidavit, Dr. Hawkins explicitly told her that the school board had decided to demote her because of her absentee-ism. These statements, made by the District's superinten-dent on behalf of the District itself, are, when read in context, direct evidence of an impermissible motivation for her loss of the bookkeeper position.

Ms. Lewis has presented circumstantial evidence of an impermissible motivation as well. Before her FMLA leave, during her FMLA leave and at the time of her termination, the actions of the school board and of the superintendent cast doubt on their claim that her removal from the bookkeeper position was for incompetence.

First, the conduct of the school board and the super-intendent during the period before Ms. Lewis was placed on FMLA leave raises the permissible inference that, while fully cognizant of their obligations to Ms. Lewis under the FMLA, they decided not to inform her of those rights and place her on FMLA leave, but instead to build a case for her discharge on the ground of incompetence. Moreover, the record reveals that, in a meeting at which Ms. Lewis' situation was discussed, the school board members referred to the requirements of FMLA with disdain. They described the Act's requirements as "just ludicrous" and "a fiasco." R.76, Ex. 5 at 25, 29. Indeed, it

was at that same meeting that the board members in-
structed Dr. Hawkins to document everything in an
attempt to build a case against Ms. Lewis based on her
performance.[7]

The actions of the school board and the superintendent
during Ms. Lewis' period of FMLA leave also raise
serious questions about their reason for discharging her.
There is evidence that, although the District was aware
that certain bookkeeper functions were not being com-
pleted adequately while Ms. Lewis was taking intermit-
tent FMLA leave, it made no effort to take adequate steps
to assuage the impact of her intermittent leave on the
District's operations. A reasonable jury could conclude that
the District, instead of taking such steps, expected
Ms. Lewis to complete all of the duties of a full-time
bookkeeper while she was working (and being paid) on
an essentially part-time basis. Arguably, when her peri-
ods of intermittent leave prevented her from timely
completing all of the duties she had performed as a full-
time bookkeeper, she was removed from her position.
Viewed in this way, a reasonable jury could find that the
FMLA leave granted to Ms. Lewis was illusory. If the
jury were to take this view of the evidence, the perfor-
mance problems noted by the district court could not
provide a permissible non-discriminatory justification
for an adverse employment action; the problems would
be, under such circumstances, the direct result of Ms.
Lewis' exercise of her FMLA rights. The jury could con-

---

[7] We emphasize that we view the school board members'
statements and actions in the aggregate, and we do not suggest
that similar statements, standing alone, would be always
sufficient to survive summary judgment.

clude that the school district had numerous options consistent with the mandates of the FMLA that did not require it to maintain the problematic status quo. It could have shifted some of the bookkeeper's job duties to other employees during the time that Ms. Lewis was taking FMLA leave. It could have hired part-time help for the bookkeeper position. It also could have transferred Ms. Lewis to another position (such as a teacher's assistant position) *temporarily* if she was unable to fulfill the essential functions of her job while taking intermittent FMLA leave. 29 U.S.C. § 2612(b)(2).[8] The District declined to exercise any of these options. In short, we believe that a jury would be entitled to conclude that the school board and the superintendent held Ms. Lewis to the unrealistic expectation that she should accomplish satisfactorily all of the duties of the bookkeeper position during her period of FMLA-protected intermittent leave. The imposition of such unrealistic expectations, if accepted by the jury, would be relevant and probative evidence of a retaliatory intent.

Finally, we believe that a reasonable jury could conclude that the actions of the District at the time of her dismissal from the bookkeeper position provide circumstantial proof of retaliatory motive. In addition to the evidence that she was demoted permanently during the

---

[8] If a temporary reassignment is made, however, the FMLA requires that the employee be reinstated to her previous position (or one comparable in duties and compensation) once her leave has been exhausted and she returns to full-time work. 29 U.S.C. § 2612(b)(2). In this case, Ms. Lewis has presented evidence that her reassignment was intended to be permanent, not temporary.

time period in which she was taking intermittent FMLA leave, Ms. Lewis also produced evidence that the school board had failed to follow its own procedures in demoting her,[9] a circumstance that, if true, could suggest a discriminatory motivation. *See Rudin*, 420 F.3d at 723. Additionally, she presented evidence that the board may have tampered with audio recordings of meetings at which her employment was discussed, evidence that we have considered to be probative of pretext or improper motivation on other occasions. *See Ogborn v. United Food & Commercial Workers Union*, 305 F.3d 763, 769 (7th Cir. 2002) (noting that evidence of tampering may be evidence of pretext, although ultimately denying the claim on other grounds). In the aggregate, such direct and circumstantial evidence is sufficient under the direct method of proof to survive summary judgment on her FMLA claim.

The district court took the view that the record contained ample evidence of performance-related problems that justified Ms. Lewis' discharge on the ground of incompetence rather than in retaliation for taking FMLA-protected leave. In the court's view, she was replaced because she was not performing adequately the duties of a bookkeeper.

---

[9] Ms. Lewis suggests on appeal that the school board members inappropriately delegated to the superintendent their duty to make employment decisions. *See Bd. of Trs., Prairie State Coll. v. Ill. Educ. Labor Relations Bd.*, 527 N.E.2d 538, 550 (Ill. App. Ct. 1988). She also intimates that Dr. Hawkins improperly made the decision to fire Ms. Lewis well before the school board meeting on March 21. Because her complaint never alleged a due process claim or any other procedural cause of action, we construe her intimations that the school board failed to follow the proper procedure as relevant solely to her FMLA claim, not as an independent cause of action.

Indeed, it listed a significant number of errors that, in its view, were unrelated to her absenteeism.[10] A trier of fact ultimately might reach the same conclusion as the district court. However, the evidence presented by Ms. Lewis casts sufficient doubt upon the District's and the super-

---

[10] The court cited the following bookkeeping errors as evidence of Ms. Lewis' poor performance as bookkeeper:

    a.   The school principal was underpaid;

    b.   Federal and local grant money received by the school district was delayed because plaintiff failed to prepare the requisite reports;

    c.   Plaintiff failed to prepare the financial report for the October 2004 board meeting;

    d.   Plaintiff repeatedly failed to pay bills on time;

    e.   Plaintiff failed to properly handle a dispute regarding an employee's retirement benefits;

    f.   Plaintiff failed to correct a known discrepancy regarding an employee's sick leave benefits;

    g.   Plaintiff erred in preparing employees' paychecks;

    h.   Plaintiff failed to timely deliver employees' 2004 W2 forms;

    i.   February 7, 2005, the district received notice that the Internal Revenue Service was imposing a \$163,160.66 fine on the district for failure to file W-2 forms for district employees for the year 2001 (plaintiff's responsibility);

    j.   Plaintiff improperly withheld Medicare payments from the paychecks of three employees even though those employees had elected not to participate in Medicare;

    k.   Plaintiff failed to properly withhold Illinois state income taxes for one employee.

R.86 at 9.

intendent's motives to make summary judgment an impermissible vehicle for the resolution of this case. Dr. Hawkins admitted in his deposition that, before Ms. Lewis took time off to care for her ailing parents, her performance had been satisfactory. He told the school board about Ms. Lewis' performance problems only after she began taking time off to care for her ailing parents, and his complaints were based largely on the fact that Ms. Lewis was not in the office to cover general office duties, answer phone calls or address questions from vendors or employees. A trier of fact could find that these problems, along with sporadic late payments, paycheck discrepancies and other problems cited by the district court, were not "performance problems" that permissibly could be attributed to Ms. Lewis, but rather were a direct result of the District's failure to respond appropriately to the challenges presented by her FMLA-protected absences. Indeed, Dr. Hawkins noted in Ms. Lewis' performance evaluation that "[m]ost of the items that are 'satisfactory' or 'needs improvement' are a direct result of your reduced hour schedule." R.67, Ex. JJ.[11]

---

[11] Ms. Lewis did not begin taking FMLA leave officially until 2004, when Dr. Hawkins first informed her of her eligibility based on the serious health conditions of her parents. However, a reasonable jury could find that the absences incurred before she was officially placed on FMLA leave were nevertheless protected conduct. As we have noted earlier, the District was well aware that Ms. Lewis was taking leave to care for her ailing parents. *See Burnett v. LFW, Inc.,* 472 F.3d 471, 478-80 (7th Cir. 2006) (explaining that an employee need not mention specifically the FMLA when requesting leave; she merely must place the employer on notice that she likely has a FMLA-

(continued...)

The District's apparent decision to hold Ms. Lewis to the standard of a full-time employee during the time that she was taking FMLA leave, in conjunction with its failure timely to inform Ms. Lewis of her rights under the FMLA, the school board members' expressed hostility towards the Act, and the other direct and circumstantial evidence presented by Ms. Lewis casts doubt on the District's proffered justification for its decision to replace Ms. Lewis as bookkeeper. Accordingly, whether the school board decided to replace Ms. Lewis at least in part because she had inconvenienced the District by missing too many days of work under the FMLA, or whether the decision was based only on the fact that it felt that she was not a very good bookkeeper, is a question of fact that must be decided by a jury.[12] Under these circumstances, we believe that the district court should have left to the jury the question of whether

---

[11] (...continued)

qualifying condition, and the burden is then on the employer to investigate whether she is entitled to FMLA leave). Despite this knowledge, it failed to notify her of her rights as required under the FMLA. *See* 29 C.F.R. § 825.301(c) ("[W]ritten notice . . . must be provided to the employee no less often than the first time in each six-month period that an employee gives notice of the need for FMLA leave (if FMLA leave is taken during the six-month period)."); *id*. § 825.301(f) ("If an employer fails to provide notice in accordance with the provisions of this section, the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice.").

[12] Both parties agree that Ms. Lewis' contract claim rises and falls with her FMLA claim. Therefore, we need not address the contract claim separately here.

Ms. Lewis' job performance, unrelated to the impact of her absenteeism, justified her removal from the bookkeeper position.

### C.

After Ms. Lewis was informed of the District's decision to replace her as bookkeeper, her husband and attorney, David Lewis, wrote an e-mail to Dr. Hawkins stating that the District's actions were in violation of the FMLA. Dr. Hawkins forwarded the letter to the District's attorney, Shane Jones. In response to this allegation, Mr. Jones informed Mr. Lewis that the District had replaced Ms. Lewis as bookkeeper based on her poor performance, a non-discriminatory justification permissible under the FMLA. Specifically, Mr. Jones' e-mail stated: "The district has determined that Ms. Lewis's performance in the bookkeeper's job assignment is not satisfactory." R.26, Ex. B. Ms. Lewis contends that Mr. Jones' statement to her husband regarding her bookkeeping skills was false and defamatory and that it caused her reputational injury.

In Illinois, a party may be liable for defamation when he publishes a false and defamatory statement concerning another, with a level of fault amounting at least to negligence. *Parker v. Bank of Marion*, 695 N.E.2d 1370, 1372 (Ill. Ct. App. 1998). However, certain statements, including statements made by a lawyer during the course of litigation, are accorded absolute privilege and therefore cannot give rise to a defamation claim. *See Atkinson v. Affronti*, 861 N.E.2d 251, 255 (Ill. Ct. App. 2006) ("An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications *preliminary* to a proposed judicial proceeding, or in

the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.") (quoting Restatement (Second) of Torts, § 586 (1977)). This principle is true regardless of the attorney's knowledge of the statement's falsity. *Id*. at 256.

On appeal, Ms. Lewis contends that Mr. Jones' statement was not privileged because it was made in response to an e-mail that Mr. Lewis had sent in his capacity as her husband, not as her attorney. However, Mr. Jones was entitled to operate under the reasonable belief that Mr. Lewis was acting as Ms. Lewis' attorney. The signature on the e-mail in question stated that the correspondence was from David E. Lewis at "The Law Office of David Lewis." R.26, Ex. A. Mr. Lewis' e-mail also referenced the District's potential non-compliance with the provisions of the FMLA, which suggested that litigation was at least being contemplated.

Additionally, even if Mr. Lewis clearly had been acting as a husband and not as an attorney, Mr. Jones' statement still would be privileged under Illinois precedent. In *Atkinson*, an attorney sent a letter directly to the plaintiff's employer, alleging that the plaintiff had engaged in wrongful acts and notifying the employer of an intention to hold it vicariously responsible. 861 N.E.2d at 256. Although the attorney's statement was made directly to the plaintiff's employer (not to another attorney), and no civil litigation ever ensued, the court held that the statements were privileged because they had been made by an attorney in contemplation of litigation. *Id*. Mr. Jones' alleged defamatory statement occurred in a context that is even more clearly privileged: It was made by an attorney, in response to a legal inquiry by another attorney,

concerning the subject matter of litigation that ultimately ensued. Accordingly, we affirm the district court's grant of summary judgment in favor of Mr. Jones on Ms. Lewis' defamation claim.

## D.

Ms. Lewis contends that the defendants, and Dr. Hawkins in particular, knew that she was in an emotionally fragile state and, in reckless disregard for her condition and aware that it would cause her severe and emotional distress, they permanently reassigned her to a lower position. She further alleges that Dr. Hawkins feigned kindness towards her in the time leading up to her dismissal, intentionally misleading her about his true intentions so that he could keep her working until he was able to find a replacement bookkeeper. His subsequent betrayal, firing her without warning and giving her job to his old friend, caused her particular emotional distress. She claims that her fragile emotional state thereby was broken, and she experienced the physical symptoms of depression and anxiety. The district court, however, concluded that "[n]one of these allegations, if true, can be considered 'beyond all bounds of human decency,' even considering defendant's authority over plaintiff and plaintiff's fragile emotional condition." R.86 at 11. It therefore granted summary judgment in favor of the defendants.

In Illinois, a plaintiff must satisfy three requirements for a showing of intentional infliction of emotional distress: "(1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that

there is at least a high probability that his conduct will cause severe emotional distress and (3) the conduct must in fact cause severe emotional distress." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). Necessarily, however, "the tort does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id*. (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). This standard is quite high. In order to meet the threshold for intentional infliction of emotional distress, the defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community. *Id.; see also Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). Therefore, "to serve as a basis for recovery, the defendant's conduct must be such that the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim[:] Outrageous!'" *Honaker*, 256 F.3d at 490 (quoting *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994)).

To determine whether the conduct alleged is extreme and outrageous, we employ an objective standard, taking into consideration the particular facts of the case. *Id*. The Supreme Court of Illinois has described a number of non-exclusive factors that may inform this analysis, including: the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity. *Honaker*, 256 F.3d at 490-92. In the employer/employee context, courts have found extreme and outrageous behavior to exist where the employer "clearly abuses the power it holds over an employee in a manner

far more severe than the typical disagreements or job-related stress caused by the average work environment." *Id*. at 491. Employers often and necessarily take actions during the course of business that result in emotional distress, but those actions cannot be classified as "extreme and outrageous" unless they "go well beyond the parameters of the typical workplace dispute." *Id*.

The events alleged in Ms. Lewis' complaint, even if true, simply do not rise to the level necessary to succeed on a claim of intentional infliction of emotional distress. *Cf. Patterson v. Xerox Corp.*, 901 F.Supp. 274, 279 (N.D. Ill. 1995) (involving the persistent harassment of a pregnant employee by her supervisor, including the berating of the employee for absence from work while the employee was hospitalized for premature labor); *Pavilon v. Kaferly*, 561 N.E.2d 1245, 1251 (Ill. App. Ct. 1990) (finding intentional infliction of emotional distress when an employer pressured an employee for dates, offered her money in return for sexual favors, and threatened to kill and rape her); *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (Ill. App. Ct. 1981) (involving an employer who engaged in an extensive course of disciplinary and harassing conduct to coerce the plaintiff to falsify work reports in violation of the law). Here, Dr. Hawkins was nice to his employee, whom he knew was experiencing problems at home; whether his motivation was simply to be compassionate or to keep her productive is immaterial. For months he told the school board that he would like to give her a little more time to get her life back on track, and he expressed sympathy about her situation. Ultimately, he and the District made what they perceived to be a legitimate personnel decision. We cannot subject employers to intentional infliction of emotional distress claims each time they decide to dis-

charge an employee—even an employee with severe emotional problems—unless their conduct truly is egregious. The district court properly granted summary judgment to the defendants on the intentional infliction of emotional distress claim.

## Conclusion

We therefore affirm the judgment of the district court as to counts III and IV, the defamation and intentional infliction of emotional distress claims. However, because Ms. Lewis has presented sufficient evidence of an impermissible retaliatory motivation under the direct method of proof to create a genuine issue of material fact for trial, we reverse the judgment of the district court on counts I and II and remand for further proceedings consistent with this opinion. Ms. Lewis may recover her costs in this appeal.

AFFIRMED in part; REVERSED and
REMANDED in part